## JOSIAH WHIPPLE JENKINS agt. JOSEPH L. WILLIAMS.

As between attorney or solicitor and client, the client has a right to have his bill of costs *taxed;* and although he may have made a formal settlement with his attorney or solicitor, and have confessed judgment for the amount of the costs as made out (without taxation) by his attorney or solicitor, yet, if the client is subsequently dissatisfied and demands a taxed bill, it is proper that the bill should be taxed.  The client is not competent to determine how much ought to be allowed as taxable costs.

*It is different, however, with *counsel fees*, there the client is competent [*262] to judge for himself what are proper allowances, and if he settles and agrees with his counsel on the amount, with a full knowledge of all the facts, he will be bound by it, and the court will not interfere.

*September Term,* 1846.

MOTION by defendant for a perpetual stay of execution, and that the judgment in this cause be set aside or satisfied.

About the first of August, 1844, the defendant retained the plaintiff, as solicitor and counselor in chancery, to appear for him in a chancery suit.  The suit was commenced in the month of July, 1844, by Jane Williams (the wife of defendant), by Marcus Holmes, her next friend, by filing a bill of complaint against the defendant before the vice-chancellor of the fifth circuit, to obtain a separation from bed and board forever between her and the defendant, and for alimony.  Defendant's appearance was entered on the 6th of August, 1844. On the 23d day of September, 1844, the defendant's answer

to the bill of complaint was filed and served. The defence set up in the answer was adultery by the complainant. The cause was decided by the vice-chancellor on or about the 4th of October, 1845, against the defendant. It appeared that Thomas H. Flandrau, Esq., was employed as associate counsel for defendant, and assisted in the management and argument of the cause. From the papers on this motion, which were very voluminous on both sides, it appeared that the chancery suit was of great importance, and was severely litigated by both parties. Flandrau stated in his affidavit, that the examination of witnesses commenced about the 3d of December, 1844, and ended about the last of May, 1845. During that period he attended most of the examinations as assistant counsel with Jenkins, and that the examinations, according to his recollection, actually occupied over two months; that about 120 witnesses were examined, whose testimony amounted to about 300 folios in length. The decree against the defendant, as first ordered in the cause, was for a yearly allowance to the complainant of $600 with costs, but was afterwards reduced to $400 per year and the costs, subject to certain specific qualifications.

The defendant, Williams, stated in his affidavit on this motion, that the plaintiff, Jenkins, on or about the 20th of October, 1845, informed him that a writ of *ne exeat* was issued against him in the chancery cause, and he would be arrested by virtue thereof unless he immediately left the state, which Jenkins advised him to do, and which information he believed to be true, and acted accordingly ; and that under the excitement of the occasion he was persuaded by Jenkins to give a bond and warrant of attorney to enter judgment [*263] upon, in favor of Jenkins against him in the *penalty of $1640.52, conditioned to pay $820.26; as well to secure the costs in the chancery suit as on a settlement thereafter to be made between him and Jenkins, should there be found anything due and unpaid, as also to place his personal property out of the reach of the complainant, and for no other purpose ; and that he was also persuaded to give to Thomas

H. Flandrau a bond and warranty of attorney in the penalty of $1000, conditioned to pay $500 for a similar purpose.

It further appeared, from the affidavit of Williams, that he left this state about the 20th October, 1845, and was absent about six months, during which time the chancery suit was settled, and on his return he requested a settlement with Jenkins, in regard to the costs in the chancery suit; that Jenkins at first put him off because he was not ready, and afterwards claimed that they had settled all of that matter. Williams then requested a taxed bill of costs, which Jenkins refused to give him.

Williams stated, that he had paid, or caused to be paid, the following charges in the chancery suit, viz. :

| | |
|---|---:|
| To complainant's solicitor by order of court, | $75 00 |
| "      do      do  · do      do  for alimony, | 325 00 |
| " complainant's solicitor, $5 per week, 61 weeks, | 305 00 |
| " complainant's solicitor on the settlement of the suit, | 2324 00 |
| " the plaintiff (Jenkins) for his costs, &c., | 1027 48 |
| " expenses on commissions, | 2 00 |
| " Joseph D. Husbands, examiner, | 24 00 |
| " Huet R. Root, examiner, | 600 00 |
| " Thomas H. Flandrau as counsel, | 520 00 |
| " expenses of commissions to Missouri, | 10 00 |

That, of the sum of $1027.48 paid plaintiff (Jenkins) as above stated, $400 was paid by a bill of lumber which he let Jenkins have during the years of 1844 and 1845; $100 Williams's check, which Jenkins received the money on, $281.23 was received by Jenkins on the sale of Williams' personal property, which was sold on Jenkins' and Flandrau's executions after Williams left the state (and $285 was received by Flandrau on his executions out of the avails of the same sale); the remainder was stated to have been paid in small sums at different times (giving the amounts and manner of payment), during the progress of the chancery suit; and all to be applied towards Jenkins's costs in the suit; that Jenkins claimed as due him on the execution in this cause $551.64 and inte-

rest. Williams stated that he was a farmer, and never before this suit had any suit in chancery, and was wholly [*264] ignorant of what the legal and proper charges *were or should be for such services; that he never had been furnished with any bill of items of the costs and charges of his solicitor and counsel in the suit, but was informed and believed the amount claimed of him was unreasonable and excessive. Two affidavits of counselors of this court were produced by Williams, one of which stated that he had examined the proceedings in the chancery suit, and in his judgment the taxable fees on the part of solicitor for the defendant, exclusive of disbursements, would amount to about the sum of $200, and the reasonable counsel fees in the cause would be $300. The other stated that he was well acquainted with all the proceedings in the cause, and in his judgment the taxable fees of the solicitor for defendant would amount to about the sum of $300, and that the reasonable counsel fees on the part of the defendant would be $500.

On the part of Jenkins, in opposition to this motion, it appeared by the affidavit of Samuel Baldwin, Esq., that he had been attorney and solicitor for six years, and for three years past counselor in this court, and counselor in chancery; that he was employed in Jenkins's office from the 3d of December, 1844, to the 2d of April, 1846, and during most of the progress of the chancery suit between Williams and his wife. That Ralph McIntosh was a student at law in Jenkins's office during the time. That Williams (the defendant) lived about three miles from Jenkins's office; when Baldwin entered the office, and down to the time when the cause was argued, in the month of August, 1845, Williams was at Jenkins's office a large portion of his time in reference to the cause; he (Baldwin) was engaged a number of days in taking testimony for Williams in the cause, and had a general knowledge of the proceedings therein, and had no doubt that Jenkins, McIntosh and himself were severally engaged in the cause, as much as one-half of the time during business hours, from the time he entered the office down to the argument of the cause; that

during that time Jenkins was so much engaged in the cause, that other business requiring attention was necessarily turned off, neglected or delayed. That soon after the decision of the case was known, Williams stated to him, at Jenkins's office, that he was utterly unable to pay the amount decreed by the vice-chancellor, and that he was determined to arrange his business, and leave the state as soon as possible, and a short time afterwards stated the same thing in substance to Jenkins, at Jenkins's office, in his (Baldwin's) presence. That Jenkins replied, in substance, that it would be folly for him to think of removing from the state; and mentioned as a reason, the loss and inconvenience to him of hastily closing up his affairs, as his property *was then situated, and after considera-     [*265] ble conversation between them, Williams repeated his determination of arranging his business and removing from the state, with the intention not to return, giving as a reason that he was utterly unable to pay the amount of the decree, and desired Jenkins to have his costs made out in the cause, that he might have a settlement with him and pay or secure him. That Jenkins soon afterwards directed Baldwin to make out a bill of costs in the cause, which was accordingly done; it occupying several days to do it, as it required much labor in the examination of entries and papers, and at that time Baldwin was a taxing officer of this court, and had done considerable of that kind of business. The bill was made out with much care, and did not contain any counsel fees or other fees not provided for by the fee bill, as he (Baldwin) believed. The amount of the bill, when finished, amounted to $720.26. Soon after the bill was completed, Williams called at the office of Jenkins, and it being presented to him, it was examined, explained and conversed about between Williams and Jenkins, and it was believed to be well understood by Williams. It was then talked about, between Williams and Jenkins, as to what amount Jenkins ought to be allowed for counsel fees and services rendered in the cause, not included in the bill of costs; in which Jenkins, after contending for a larger sum and Williams against allowing it, finally agreed to take, and Williams

agreed to allow the sum of $500. That Jenkins had at that time spent considerable time and labor in arranging the business of Williams to enable him to remove from the state, and about some considerable other business connected with such removal, and the sale of his real estate, bank stock, and some other property then remaining to be sold, and the sum of $100 was finally agreed upon between Williams and Jenkins for such service, as a proper remuneration to Jenkins. The amount of Williams's account, which was for lumber, timber, and money furnished Jenkins by Williams, was then examined and talked over, and ascertained, from the bills, memorandums and evidences thereof produced, to be, and which was mutually agreed upon between Jenkins and Williams, the sum of $500. Baldwin then added together the sums agreed to be allowed Jenkins, and took therefrom the sum of $500, the amount agreed to be allowed Williams, which left a balance due Jenkins of $820.26, and which was then mutually agreed upon as the balance due from Williams to Jenkins. Baldwin stated that the settlement was made in a fair and considerate way and manner, and, as he believed, according to the true intention and understanding of Jenkins and Wil-
[*266] liams. Baldwin was then directed to draw up *a bond and warrant of attorney to Jenkins for the entry of judgment for the balance found due to Jenkins, which were then duly executed and delivered by Williams, Baldwin being the subscribing witness. Baldwin stated that he had repeatedly heard Williams express his entire satisfaction with the manner of conducting and managing the suit by his counsel ; and that, whatever might be the result of the litigation, he should be satisfied that everything had been done in his behalf that could be.

Jenkins's affidavit corroborated the facts of the settlement between him and Williams, as stated by Baldwin, and entered very minutely into all the proceedings had in the chancery suit. That since the settlement with Williams, he had received $281.23, which was endorsed on the execution after the sale of Williams's personal property. Jenkins also stated how

and in what manner he did dispose of all the money, &c., he had received of Williams from time to time, which went to make up the sum of $1027.48 stated by Williams to have been paid on and towards his costs in the chancery suit; $500 was allowed on the settlement as stated by Baldwin, $281.23 received on the execution, and the remainder expended during the progress of the suit for disbursements in the suit, and for the benefit of Williams in carrying on the suit, giving particulars. Jenkins stated that, from the importance of the case, as well as the great anxiety of Williams on the subject, he was induced to attend to the suit in preference to any other business, and to bestow his time freely in search of evidence and ascertaining the evidence to be given; that he devoted his most unremitted attention and his best energies to the defence of the suit, and believed that $500 was not an adequate compensation for his service in the cause, from its commencement to the decision of it by the vice-chancellor, over and above the services chargeable in a taxed bill of costs against his client. Jenkins stated that he did not know nor had he heard, on or about the 20th of October, 1845, that a writ of *ne exeat* had been issued against Williams, nor did he know that any such writ had been issued, until after Williams had left the state. That he never, in any manner whatever, at any time, advised Williams to leave this state, and denied that there was any agreement or understanding between him and Williams; that when Williams returned to this state, or at any other time, he and Williams would have a full and just settlement of their dealings, and ascertain how much, if anything, would be due him under the judgment, or anything of like effect; but upon the confession of the judgment by Williams, the settlement was full and final, and, as he had no doubt, was so understood by Williams. After the return of Williams to this state, *he called on Jenk-   [*267] ins and wanted to settle with him; Jenkins, supposing he wanted to pay the amount due on the judgment, directed his clerk to make out the amount, and soon afterwards a statement of it was handed to Williams, who, without making

any objections or intimating that anything was wanting, took the statement away, and in a few days called on Jenkins and threatened him with a litigation in regard to the judgment, and demanded a 'taxed bill of costs in the chancery suit. Jenkins stated that, on perceiving the disposition of Williams to get up a litigation with him, he paid but little attention to his request for a bill of costs, although he would willingly have made out such bill for the satisfaction of Williams, had he called for it in a friendly manner. When Williams demanded the bill of costs (which was in June last), he for the first time claimed that he had never had any settlement with Jenkins.

Thomas H. Flandrau stated, that he was counsel with Jenkins in the chancery suit against Williams, and attended most of the examinations with Jenkins as assistant counsel, which actually occupied over two months; that, from his knowledge of the proceedings, he believed that, in preparing for the examinations and attending them, at least one half of Jenkins's time, during six months, was fully occupied; that he well knew the labor and services bestowed by Jenkins and his clerks in the chancery suit, and that over and above the taxable services, as between solicitor and client, he believed that $500 would not be an adequate counsel fee to compensate Jenkins for his services in the cause. Flandrau stated that it was not true that he ever received from Williams the sum of $520, as collected on his execution by the sheriff on the judgment against Williams, mentioned in Williams's affidavit; that the only amount received was $285 in his favor.

Jenkins produced the affidavits of two other counselors, who were acquainted with the proceedings in the chancery suit, who severally stated that, in their opinion, $500, over and above the taxable costs in the cause, was no more than a reasonable compensation to Jenkins for his services as counsel in the cause.

 T. C. CLARK, *defendant's counsel.*

 E. J. RICHARDSON, *defendant's attorney.*

 S. STEVENS, *plaintiff's counsel.*

 J. WHIPPLE JENKINS, *attorney in pro. per.*

BRONSON, Chief Justice.   As to the $500 counsel fee in the chancery suit, and the $100 for other business, the defendant was competent to judge for himself what were proper allowances; and having settled and agreed on the amounts, with a full knowledge of all the facts, there is no ground on which the court can refer it to the vice chancellor, or any one else, to say what were the proper sums to be paid for those services.

*But, in relation to the sum which was allowed on   [*268] the settlement as for taxable costs, the case is different.
The defendant was not competent to determine how much ought to be allowed.   He undoubtedly acted upon the plaintiff's statement, that the charges made were taxable costs ; and, without intending to intimate that there has been anything wrong on the part of the plaintiff, we think it proper that the bill should be taxed.

*Ordered*, that all proceedings on the judgment and execution in this cause be stayed, until the plaintiff shall have caused his bill of costs, as solicitor for the defendant in a suit brought against the defendant in the court of chancery, by his wife, Jane Williams, to be taxed, upon due notice to the defendant's attorney on this motion.   And in case the bill shall be taxed at less than the sum of $720.26, it is *further ordered*, that the difference be credited and allowed to the defendant on the judgment and execution in this cause.