(70 Misc. Rep. 30.)

### RANSOM v. RANSOM et al.

(Supreme Court, Special Term, New York County. December, 1910.)

1. PERPETUITIES (§ 6*)—POWER OF ALIENATION—TRUSTS.

　　Where, upon the death of the life beneficiary, under a trust in a will, the income becomes payable to those entitled to the next eventual estate under Real Property Law (Consol. Laws, c. 50) § 63, providing that when in consequence of a valid limitation of an expectant estate there is a suspension of the power of alienation or ownership during the continuance of which the rents and profits are undisposed of, and no valid direction for their accumulation is given, they shall belong to the person presumptively entitled to the next eventual estate, and Personal Property Law (Consol. Laws, c. 41) § 11, providing that the absolute owner-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ship of personalty shall not be suspended by limitation or condition longer than during the continuance of not more than two lives in being, at the death of testator, if the instrument containing the limitation be a will, such income is not inalienable under Real Property Law, § 103, providing that the right of the beneficiary of an express trust to receive the rents and profits of realty and apply, them to the use of any person cannot be transferred by assignment or otherwise, but that the right of a beneficiary of any other trust in realty may be transferred, nor under Personal Property Law, § 15, embracing a like provision as to the right of a beneficiary to enforce performance of a trust to receive the income of personalty.

[Ed. Note.—For other cases, see Perpetuities, Dec. Dig. § 6.*]

**2. ATTORNEY AND CLIENT (§ 147*)—CONTINGENT FEE—REDUCTION.**

Where an attorney obtained a contract for a large contingent fee from a client who was not fully advised of the slight risk of an adverse decision nor that a previous decision of the Appellate Division in her favor had been rendered unanimously, and the attorney was the client's confidential adviser and exaggerated the risk in his own mind, there being no fraud in the transaction, the fee should be reduced to a reasonable amount.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 351; Dec. Dig. § 147.*]

Action by Albert W. Ransom against Edith M. Ransom individually and as executrix of George A. Barker and others. Judgment rendered.

Action by attorney to recover for professional services, under a contingent fee contract.

George W. Alger, for plaintiff.
Francis M. Wellman, for defendant Ransom.
Henry Bacon, for defendant trustees.

WHITNEY, J. Plaintiff, an attorney at law, claims a one-fifteenth interest in the income and principal of the residuary estate of George Bell, deceased, under an assignment thereof from the defendant, Edith M. Ransom, by way of contingent fee. She contests the fee and the assignment as fraudulent and unconscionable. Her codefendants, the trustees under the will, ask to be advised as to their duties. I shall adopt the plaintiff's testimony upon this trial as in substance correct, except that I think that, honestly, as I believe, he has much exaggerated in his own memory the completeness with which he gave his client to understand, and she did understand, the questions of fact and law involved in deciding upon the amount of the fee. The Bell will left his residuary estate, now about $1,200,000 in value, to trustees to pay the income to his nephews, George A. Barker and Charles G. Barker, and his niece, Mary Leavitt, during the life of his daughter Catharine B. Bell. George has died, but Catharine is still living, over 70 years of age and without issue. The will provides that upon her death without issue one-third of the principal shall go to George, one-third to Charles, and one-third in trust for Mrs. Leavitt. The scrivener overlooked the possibility that Catharine might survive one of the others. Hence the income of George's share between his death and that of Catharine is unprovided for. George A. Barker died January 27, 1907, leaving, besides a widow (now the defendant Edith M. Ransom), two

daughters by a prior marriage. He devised and bequeathed his interest in the Bell estate to his widow. He advised her to retain the plaintiff, by whom the will had been drawn, as her attorney. Plaintiff had been on intimate terms with the testator and had known her well also. He enjoyed her entire confidence, and, indeed, as her letters show, her warm personal friendship. She was to an unusual degree confiding, loyal, and generous, while utterly incapable of grasping matters of detail.

After a contest in the Surrogate's Court by the stepdaughters, the will was probated. Plaintiff was the widow's attorney in those proceedings and was paid in full for his services. At her husband's death an action was pending for the construction of the Bell will for the purpose of testing the alienability of the three residuary interests. He had been advised that these interests were not alienable and was so contending in the action. If this contention had been correct, his own share would have lapsed at his decease, without question, although holding it alienable or even vested would not of itself settle his right to will the interest upon predeceasing the cestui que vie. The Appellate Division had held that the income could not be alienated, but that the principal could be. Stringer v. Barker, 110 App. Div. 37, 96 N. Y. Supp. 1052. An appeal had been taken to the Court of Appeals upon the income question alone. The parties contesting the alienability of the principal had not appealed. Mrs. Barker had heard her husband state a positive opinion that this contention in this case was correct, and therefore was most unwilling to spend any money in maintaining her claim to the property. She had about $50,000 in her own right, and wished to keep that intact and not spend any of it in legal expenses, although the value of her husband's third in the Bell estate was $400,000. In my opinion it was not necessary for her to spend any large sum of money on it. It is difficult to conceive a clearer case of a future estate defeasible only upon a single contingency, and that contingency was the birth of future issue to a woman over 70 years of age. The question was not really raised upon the pending appeal, but it was advisable to do what the plaintiff actually advised, namely, to file a brief in order to procure favorable and avert unfavorable dicta. He was familiar with the case, having assisted the trustees' attorneys in it since its commencement, and he could have afforded to draft such a brief for a sum that his client would doubtless not have hesitated to pay. But when plaintiff took this matter up with his client she quoted her husband's opinion that "he would have to outlive Catharine Bell before he would get anything." Plaintiff said: "I had previously been of that opinion, but I changed my opinion, and there is considerable to it. * * * I told her she was very foolish; she should assert her claim for this Bell remainder under the will, and she said no; she proposed to keep what she had," and proposed that he take it up on some other arrangement. Subsequently he told her that he would take it for 25 per cent., or a $100,000 interest in the remainder. She said at once that it was satisfactory. He tried in vain to get her to consult her brother or somebody else, but she did not want to ask them about it. Finally he prepared a contingent fee contract. He persuaded her to go down with him to the Broadway Savings Insti-

tution, where she was a depositor, and where he read the contract over in her presence to the president and asked for his advice. She said, according to the president's testimony, "that she was satisfied without coming over, but Ransom insisted, * * * she was perfectly satisfied with it; did not see the necessity of coming; she had come to please him," and that she had no questions to ask. Plaintiff testifies that he said to his client: "Mrs. Barker, you understand now if I win out on this thing it gives me a big fee; it gives me perhaps $100,000." But she said, "Yes, I know that, but I get $300,000." Thereupon the contract was executed.

The contract, which was signed June 4, 1907, contains profuse recitals, although it does not refer eo nomine to a contest that had just been commenced by the stepdaughters against their father's will, and which was by far the most serious and laborious litigation connected with the estate. It provided for plaintiff's employment in all suits "affecting in any wise whatever" her rights in the Bell property for a compensation of 25 per cent. of what she should receive as income or principal, "whether under said-will of George A. Barker or as widow by intestate succession and distribution." Plaintiff's obligation was so worded as to secure his services in all matters through and including the future final accounting after the death of Catharine Bell. In the following winter the Stringer Case came on for argument at the Court of Appeals. He did not attend personally, but filed a brief in support of the theory that the remainders under the Bell will were vested. His argument on the point is a little over four pages long, and cites but one case that had not been cited by the Appellate Division, and I do not perceive that this case helped his client. The appeal was orally argued by counsel for other parties and the decision was favorable. Stringer v. Young, 191 N. Y. 157, 83 N. E. 690. If there had been any real difficulty about the point, however, I do not see any particular importance in the court's decision from his client's point of view. As the Appellate Division had pointed out, the remainder was alienable whether vested or contingent. In holding it vested the court did not pass upon the question whether it could be divested, or where, if so, the property would go. Shortly thereafter the will contest resulted in a long trial and a verdict for the stepdaughters upsetting the will. An appeal was taken by plaintiff for his client. The Appellate Division held that there was enough in the case to go to the jury, but set aside the verdict and ordered a new trial. Plaintiff was the widow's attorney of record. He did the main work in preparing the case for trial and made suggestions for the brief on appeal. But the case was actually tried, the brief prepared, and the appeal argued by other counsel specially retained. After the reversal plaintiff accepted a proposition of settlement by which the stepdaughters took one-tenth each in full, leaving to his client a $320,000 interest in the fund. Plaintiff then asked for his assignment under the contingent fee contract. The settlement with the stepdaughters had reduced the widow's interest from $400,000 to $320,000 and his own share from $100,000 to $80,000, but he advised her that his services in the will contest were not covered by the contingent fee, so that she must settle with him for those in addition, and he suggested that the odd $20,000 would reasonably cover

them. They therefore settled their accounts on a basis of $100,000 for him and $220,000 for her, and she met her supposed obligation by assigning to him on January 27, 1909, one-quarter of the interest that originally she had had. She had by this time already for some months received advice from various quarters that she was being imposed upon, but remained loyal to her attorney. Shortly thereafter, however, she became dissatisfied and complained. This resulted in a final readjustment on May 7th following, when the income check came in from the trustees as the result of their judicial accounting in this court. The result of her complaint was his selling her one-fifth of his contingent interest for the sum of $2,500 in cash, which she paid him on that day. This occurrence he treats as a compromise barring all inquiry into the reasonableness of his fee as then finally established; but I think that she was still largely under his influence, so that his apparent generosity in making so large a concession led her into an acquiescence that is not unreviewable in equity. A few weeks after this reassignment she married one of the previously disregarded advisers. Immediately thereupon she dispensed with plaintiff's services and retained a new attorney.

It is necessary first to determine whether Mrs. Barker's interest in the income is assignable, since otherwise plaintiff cannot ask for an accounting from the trustees, and hence has no standing in equity during the pendency of the life estate at all. Higgins v. Higgins, 101 App. Div. 119, 124, 91 N. Y. Supp. 937. Had she been designated in the will as life beneficiary, her interest would have been nonassignable under the provisions of the Revised Statutes now represented by section 103 of the real property law (Consol. Laws, c. 50) and section 15 of the personal property law (Consol. Laws, c. 41). Stringer v. Young, supra. But her life interest in the income does not come directly from the will. The testator failed to provide for this share of the income, and it comes to her by statute as the person presumptively entitled to the next eventual estate under what are now section 63 of the real property law and section 11 of the personal property law, as shown by Mr. Justice Morschauser in his opinion upon the trustees' last accounting. Young v. Barker, 127 N. Y. Supp. 211; Kilpatrick v. Johnson, 15 N. Y. 322; Matter of Tompkins, 154 N. Y. 634, 646, 49 N. E. 135; Meldon v. Devlin, 31 App. Div. 146, 156, 53 N. Y. Supp. 172; Id., 167 N. Y. 573, 60 N. E. 1116. Beneficiaries may alienate except so far as the statute prohibits. Dyett v. Central Trust Co., 140 N. Y. 54, 35 N. E. 341; First Nat. Bank v. Nat. Broadway Bank, 156 N. Y. 459, 472, 51 N. E. 398, 42 L. R. A. 139.

Literally read, the statute as it existed at the date of the Bell will prohibited any assignment (1 Rev. St. [1st Ed.] p. 730, pt. 2, c. 1, tit. 1, § 63); but I do not think that a literal reading is necessary, since the object of the provision was merely to protect the persons who were the objects of the grantor's or testator's bounty. The person presumptively entitled to the next eventual estate does not become an object of the grantor's or testator's bounty until the next eventual estate falls in. Meanwhile his income is derived from a statute analogous to the statute of distributions. The purview of the nonassignabil-

ity clause should not be extended, for in its application to this class of trusts it extends a class of extravagance-free and luxury-free, but judgment-proof and execution-proof, incomes, that, in the case of beneficiaries sui juris, are contrary to the present views of public policy in this state (Code Civ. Proc. § 1391, as amended by Laws 1908, c. 148), are disapproved by high authority elsewhere (Gray on Restraints on the Alienation of property [2d Ed.] Append. 1A), and quite probably were never intended by the revisers who drew or the Legislature which adopted the statute whose protection this lady seeks. See dissenting opinions of Bronson, J., in Leggett v. Perkins, 2 N. Y. 297, 321, and Denio, C. J., in Graff v. Bonnett, 31 N. Y. 9, 15, 88 Am. Dec. 236.

Mrs. Barker's income being assignable, the remaining question is whether the assignment should stand at all, and, if so, for what amount. Plaintiff has come into a court of equity, and he can obtain a decree for so much only as equitable doctrines permit. He seeks to enforce a contract with a client, and "is bound to establish affirmatively that it was made by the client with full knowledge of all the material circumstances known to the attorney and was in every respect free from fraud on his part or misconception on the part of the client, and that a reasonable use was made by the attorney of the confidence reposed in him. The general principle is firmly established and universally recognized." Whitehead v. Kennedy, 69 N. Y. 462, 466. Among the cases approved by the Court of Appeals in the case from which this quotation is made is Gibson v. Jeyes, 6 Ves. 266, 278, where Lord Eldon said of a sale by attorney to client that he might contract with her if she insisted, "but then he should have said, if he was to deal with her for this, she must get another attorney to advise her as to the value, or, if she would not, then out of that state of circumstances this clear duty results from the rule of this court and throws upon him the whole onus of the case; that, if he will mix with the character of attorney that of vendor, he shall, if the propriety of the contract comes in question, manifest that he has given her all that reasonable advice against himself that he would have given her against a third person. It is asked where that rule is to be found. I answer in that great rule of the court that he who bargains in matter of advantage with a person placing confidence in him is bound to show that a reasonable use has been made of that confidence." The court also cite 1 Story's Equity Jurisprudence, § 311, where Mr. Justice Story says:

"On the one hand, it is not necessary to establish that there has been fraud or imposition upon the client; and, on the other hand, it is not necessarily void throughout, ipso facto. But the burden of establishing its perfect fairness, adequacy, and equity is thrown upon the attorney. * * * If no such proof is established, courts of equity treat the case as one of constructive fraud."

There is nothing inequitable about a contingent fee computed upon a percentage basis, although it be altogether disproportionate to what would be reasonable compensation for the lawyer's services if paid for in cash when rendered. Not only is there long delay in recovery, but services covering years may never be compensated at all. I think that

the contingent fee should often be approved not only in the case of the penniless litigant, but also in the case of the litigant in the position of Mrs. Barker, possessed of but moderate means. One so situated should be able to arrange with some attorney in such a way that if unsuccessful her own funds should remain altogether intact or be diminished only by a moderate retainer; while in return for the risk that his services may thus be thrown away or only in small part compensated he has a chance of receiving an amount much greater than their cash value. In fact, when a lawyer sues his client upon a quantum meruit, the law as laid down by our courts makes the fee largely contingent upon success. Randall v. Packard, 142 N. Y. 47, 55, 36 N. E. 823. A remarkable recent instance is Town of Hempstead v. City of New York, 86 App. Div. 300, 302, 83 N. Y. Supp. 806. The contingent fee has long been sustained not only in this state (Fowler v. Callan, 102 N. Y. 395, 7 N. E. 169), but in the Supreme Court of the United States also (Wylie v. Coxe, 15 How. 415, 14 L. Ed. 753; Stanton v. Embury, 93 U. S. 548, 23 L. Ed. 983; Ingersoll v. Coram, 211 U. S. 335, 29 Sup. Ct. 92, 53 L. Ed. 208).

In my opinion the abuses commonly attributed to contingent fees are mainly attributable to one class only of the business so compensated, namely, that obtained by so-called ambulance chasing and other methods of touting for clients. Clients, whether touted for or not, are sometimes grossly overcharged, whether by way of contingent fees or other agreed fees, or fees exacted as representing a quantum meruit. In all these cases a court of equity should see that equity is done when the matter comes within its jurisdiction. The American Bar Association in 1908, after full debate upon the report of its very able committee on the Code of Professional Ethics, adopted as a canon of its Code that "contingent fees, when sanctioned by law, should be under the supervision of the court in order that clients may be protected from unjust charges." The same canon was adopted by the New York State Bar Association in 1909. It is addressed rather to the judges and the legislators than to the bar, and legislation may perhaps be necessary to carry it fully into effect; but I do not know of any statute or controlling decision which limits the supervising power of the court when the matter comes into equity. Plaintiff puts much reliance upon the language of section 66 of the Code of Civil Procedure (now section 474 of the judiciary law [Consol. Laws, c. 30]), which provides that an attorney's compensation is governed by agreement, "which is not restrained by law," which he understands to include a prohibition against its supervision in equity. But that this language of the Throop Code was not intended to vary the meaning of the old Field Code of Procedure is shown by the revisers' own declaration. In appendix B to their report, containing a list of the sections in which the law is amended, they omit section 66 (Code of Remedial Justice [Throop's Ed. 1876] p. 516), thus relegating it to the class of redrafts "whose sole object is to conform the syntax of the terms used to those of other portions of the bill, to prune down redundant expressions, or otherwise to attain greater simplicity and clearness without material change of the meanings." Id. p. 515. The present words "which is not restrained

by· law" replace a provision of the old Code (Code 1848, § 258, Code 1849, § 303) which repealed all then existing statutes regulating attorney's fees, together with "all existing rules and provisions of law restricting or controlling the right of a party to agree with an attorney, solicitor or counsel for his compensation." The statutes thus repealed provided an elaborate scale of fees as between the lawyer and his client; the former being put upon much the same footing as a clerk, master in chancery, or sheriff (2 Rev. St. [1st Ed.] pp. 623–631, pt. 3, c. 10, tit. 3, §§ 4–6, 14, 15; Id. p. 634, § 20; Id. p. 651, §§ 8, 9; Id. p. 652, §§ 1, 2; Laws, 1840, c. 386, as amended by Laws 1844, c. 273; Common-Law Rule 72 of 1847); the fees being taxed just as the costs between the parties to an action still are, as instanced in Jenkins v. Williams, 2 How. Prac. 261, 263–265, 267, 268; B'klyn Bank v. Willoughby, 1 Sandf. 669. As far as related to compensation of counselors, indeed, as distinguished from attorneys, the bill was well settled to be applicable only upon a taxation of costs as between the opposing parties (Stevens v. Adams, 23 Wend. 57; Id., 26 Wend. 451); but as to attorney's fees proper the statutory fees bill seems to have been enforced (26 Wend. 457, 461, supra; Wallis v. Loubat, 2 Denio, 697; Jenkins v. Williams, supra), and the object of the codifiers was to give the attorney the same right of contract "as in respect to every other professional person" (Report of Code Commissioners, 1848, pp. 204, 205). The jurisdiction of equity over persons in confidential relations stood untouched.

The recent precedents upon which plaintiff relies, when properly understood, merely hold that when there is no pending relation of attorney and client, but a lawyer and a layman meet and talk over a proposed lawsuit with a view to the future retainer of the lawyer, and the parties are fully at arm's length, when the circumstances bearing upon the proposed contract of retainer are fully presented to the layman, and there is no appearance of imposition and undue influence, the contract which they make will stand. In Werner v. Knowlton, 107 App. Div. 158, 94 N. Y. Supp. 1054, the question was whether the fairness of a contract so made could be submitted to review by a jury in a common-law action. In Burke v. Baker, 111 App. Div. 422, 97 N. Y. Supp. 768, plaintiff had obtained special expertness in a line of cases and had been discharged as attorney. The clients found that they had to get him back again. Dealing then at arm's length, they could not complain of the bargain that they had to make. In Matter of Fitzsimons, 174 N. Y. 15, 23–25, 66 N. E. 554, it was held that a contract of retainer and lien could not be set aside on the sole ground that the contingent fee was unconscionable per se. It was 50 per cent., and the amount involved stated to be large; but there was no proof as to what the amount really was or what services were performed or expenses incurred. The court said, however, that if "the compensation provided for was so excessive as to evince a purpose to obtain improper or undue advantage the court may correct any such abuse," and that, if at the trial "it shall be shown that the amount involved was unconscionable, it is fair to presume that the court will make such disposition of the matter and establish the appellant's lien to such an extent

only as shall be legal in view of the agreement between the parties." In Ransom v. Cutting, 112 App. Div. 150, 98 N. Y. Supp. 282, Id., 188 N. Y. 447, 81 N. E. 324, the parties were at arm's length; the relation of attorney and client not having preceded the contract. The whole situation was understood by the proposed client. If the language of the court is capable of being read as excluding the jurisdiction of equity to inquire into whether he understood the circumstances affecting the conscionability of the fee fixed by the proposed agreement, then I think that it must be treated as to that extent obiter. "We take it to be a sound principle that no proposition of law can be said to be overruled by a court which was not in the mind of the court when the decision was made." Woodruff v. Parham, 8 Wall. 123, 19 L. Ed. 382. In Weeks v. Gattell, 125 App. Div. 402, 109 N. Y. Supp. 977, the rule of the Fitzsimons Case was applied where the contingent fee was 75 per cent. instead of 50 per cent. Morehouse v. B'klyn Heights R. R. Co., 185 N. Y. 520, 523, 78 N. E. 179, merely holds that the question of conscionability must be passed upon when raised. The distinction between agreements made before retainer and those made thereafter is well pointed out in Boyd v. Daily, 85 App. Div. 581, 586, 587, 83 N. Y. Supp. 539. On the other hand, it is held that even in the case of an agreement originally conscionable in itself a court of equity, if its jurisdiction is invoked, may limit the lawyer's compensation to a lesser amount if the circumstances are such that to insist upon his full contract right "would expose him to the reproach of oppression and overreaching." Matter of Friedman, 136 App. Div. 750, 121 N. Y. Supp. 426.

It is common practice in this court, when a small settlement is offered at an early stage of an infant's action for personal injuries before much attorney work has been done, and it becomes necessary for the guardian ad litem to petition for leave to accept the offer, to require that the attorney scale down his fee so that it shall not exceed a sum reasonably proportionate as between his own work and the infant's sufferings. Upon reviewing all the authorities I do not find any that diminish the force of the ancient rules of chancery affecting contracts between persons in confidential relations. This plaintiff secured his contingent interest after he had already for a considerable time been the widow's confidential adviser and friend as well as counsel, and while the work for which he was seeking compensation was already progressing. It remains to consider how he bears the burden that is put upon him.

I am unwilling to believe or find that the contingent fee contract was fraudulent in any sense, although there is much that would support such a finding; but she was entitled to full information not only as to what the contract meant, but also as to what risk there was in the litigation to which it was to apply. From his own testimony as well as hers it seems to me clear that she never was advised how trifling was the risk, if any, of her losing the remainder interest by any judicial construction of the Bell will. I believe this failure on his part to have been due in main to exaggeration of the risk in his own mind; but his charge is based on the assumption that he was a specialist in the con-

struction of wills as well as in Surrogate's Court practice, and must be treated as if the assumption were correct. It also appears to me that she was not made to understand that the judges who had considered the will had been unanimous in construing it in her favor. She evidently supposed that to obtain the remainder for her would be a legal triumph for which she could well afford to offer $100,000 in case of success, involving a litigation in which she would wisely refrain from putting any of her moderate property at stake. The reading over of the contract in the presence of a layman like the bank officer was a mere farce that could have had no effect further than to confirm her in the view that her own equities in the matter of legal expenses were being thoroughly sheltered. Since the bank officer could not intelligently advise her without first obtaining for himself some understanding of the amount at stake and amount at risk, I think that plaintiff should not have permitted her to sign and acknowledge the paper after such a conference and nothing further.

Defendant contends that as a consequence the contract should be set aside for all purposes and plaintiff's fees settled on a quantum meruit basis; but she also is asking the aid of equity, and this seems to me inequitable. She insisted that the fees should be contingent, although she had money enough of her own to pay cash. Credit is not as cheap as cash, even when the term of credit is no longer than until the death of a life tenant already over 70 years of age. Moreover, it had not been decided that she would be entitled to the income of the trust estate meanwhile, and her right thereto was being denied both by her husband's surviving brother and sister and by the trustees on behalf of Catharine Bell. Nor had it been, or has it been until now, decided that if she was entitled to the income she could assign it. Therefore I think that the court, having put itself in the place of the parties as they stood on June 4, 1907, should reduce the contingent fee to a reasonable percentage. The whole Bell estate amounted to $1,200,000, of which about $100,000 was real estate not converted by the will into personalty. Hence, if her stepdaughters' will contest should fail and the income go elsewhere than to her, she would get $400,000 upon the death of Catharine Bell. If the will contest should succeed, she would get but $100,000. She also had a good chance, but not a certainty, of getting the law so construed as to give her the income of one of these two amounts meanwhile, as well as the income of her dower interest of $11,000. Her attorney would very likely have to take the question of assignability of income to the Court of Appeals, besides filing his brief about the vesting of the remainder. He would have to see that the trustees behaved right and accounted from time to time, besides bearing his share in the final settlement of the estate. There might be difficult questions coming up from time to time, and there might also be, as in fact there has been, some altogether unnecessary litigation. Catharine Bell might easily live 20 years to come, while he himself might meanwhile die, leaving his estate to provide for finishing the work; or his client might discharge him, as she has since actually done. What would then happen to his contingent fee was a matter of uncertainty. While 50 per cent. is often a reasonable contingent

fee under the conditions in this county, yet a small fraction of the amount should be sufficient when the stake is so large and the probable work so small that at the very worst the attorney's natural per diem compensation will be recovered.

In view of all these circumstances, I think that a 7½ per cent. contingent fee in this case would have been reasonable. This would have given him, if he did all the necessary work, with reasonable certainty, at least the present value of $7,500 payable at Catharine Bell's death; at most $30,000, probably $15,000 to $24,000, payable at her death and carrying income meanwhile. He was a young man, little more than ten years at the bar, whose work had mainly been done in assisting his office associates, and the smallest possible fee upon this basis would probably pay him at far more than the per diem rate to which he was accustomed. In arriving at this figure I have disregarded his work in the will contest, which constituted his most important service, and would have justified a far higher percentage. This is because he himself took the position that it was not imposed upon him by the contract of June 4, 1907, but must be compensated independently. He demanded and received $20,000 interest in the Bell estate, which he afterward commuted for $2,500 in cash, as has been seen, and as against this he had contributed $1,100 toward the fees of special counsel. Were this result unfavorable to his client, it would require particular attention, for his construction of the original contract seems to me indefensible, and in a matter involving so large an amount of money I think that he should have insisted upon her consulting other counsel before accepting that construction. But it is sufficient to say that he is estopped from disputing a construction the final result of which was to net him but $1,400, where a very much larger amount would have been recoverable upon a quantum meruit. The assignment must therefore stand as security for so much of his percentage interest as may represent the proportion which he has done of the work which he agreed to do. His client had a right to discharge him at any point until the whole work should be so nearly finished that what remained to be done might be treated as negligible, as in Carlisle v. Barnes, 102 App. Div. 573, 92 N. Y. Supp. 917, as explained in Severance v. Bizallion, 67 Misc. Rep. 104, 105, 121 N. Y. Supp. 627. When the services are terminated by the client at an earlier point, as occurred in this case, the proportion must be fixed by the court (Johnson v. Ravitch, 113 App. Div. 810, 99 N. Y. Supp. 1059); but I find no authority restricting his recovery to a quantum meruit. In Roake v. Palmer, 119 App. Div. 64, 66, 103 N. Y. Supp. 862, the services were terminated by consent. In Matter of Snyder, 190 N. Y. 66, 82 N. E. 742, 14 L. R. A. (N. S.) 1101, 123 Am. St. Rep. 533, the contract was disavowed by the client as illegal and so held by the court. It seems to me inequitable that a client should have an option to stand by the contingent feature of the employment if it turns out unsuccessful, but to turn it into a cash arrangement at moderate cost to himself if he sees that it is going to succeed. It seems to me equitable that a fair apportionment should be made of the contingent fee as between the work done and the work undone at the time of the attorney's dis-

charge. Any doubt should be resolved in his favor, as the other party alone, by "a singular feature of the law," has an option to terminate the contract. Tenney v. Berger, 93 N. Y. 524, 529, 45 Am. Rep. 263.

Plaintiff having carried through to judgment at Special Term the first judicial accounting of the Bell estate under the new situation caused by the death of George A. Barker and substitution of the new trustees, and having obtained a judgment, which, I believe, should and will stand, establishing his client's right to the income of her share until the principal shall fall in, and it not being shown that there is any present probability of any difficulties arising in the future, I think that three-quarters of the contingent fee as now finally settled may be fairly apportioned to him. This will fix his share of the remainder at $18,000, and give him the income thereof during the life of the cestui que vie. As against this he is accountable for the taxable costs which he has collected. His contract having fixed his compensation without providing for his retaining these, they belong to his client. Taxable costs were provided for the purpose of reducing the legal expenses of the successful party, not as extra pocket money for his attorney. See Report of Code Commissioners, 1848, p. 207; McIlvaine v. Steinson, 90 App. Div. 77, 82, 85 N. Y. Supp. 889; Caccia v. Isecke, 123 App. Div. 779, 108 N. Y. Supp. 542. The judgment should charge him with the amount of these costs and all advances on account of past income in excess of his share as now fixed, and should credit him with his share of so much of the $5,000 allowance made to his client on that day as exceeded her actual disbursements proved.

Judgment is awarded in accordance with these views, with costs to the defendant trustees as against the plaintiff.

Judgment accordingly.