GRAEBER et al. v. McMULLIN.

MARTIN v. SAME.

Nos. 471, 495.

Circuit Court of Appeals, Tenth Circuit.

Feb. 23, 1932.

Rehearing Denied April 13, 1932.

Edwin H. Park, of Denver, Colo., for appellants Graeber and another.

Albert L. Vogl, of Denver, Colo., for appellant Martin.

John F. Mail, of Denver, Colo., for appellee.

Before COTTERAL and PHILLIPS, Circuit Judges, and JOHNSON, District Judge.

JOHNSON, District Judge.

The records in the above-entitled cases disclose that they were tried together in the court below. They were decided by that court upon the same evidence. The transcripts of the evidence in the records of the cases in this court are identical. Martin, the appellant in case No. 495, deraigns his title from Graeber, one of the appellants in case No. 471. This is also true of Latta, the other appellant in No. 471. The two cases are controlled by the same legal principles and may be, and for convenience will be, disposed of by one opinion in this court.

The matters and transactions leading up to the suits are as follows: Bentley M. McMullin, appellee, is an attorney at law practicing his profession at Denver, Colo. On January 28, 1927, he and R. F. Graeber, one of the appellants, entered into the following agreement: "It is hereby agreed between R. F. Graeber and Bentley M. McMullin that the said Bentley M. McMullin is hereby employed as the attorney of R. F. Graeber to prosecute and collect a claim which R. F. Graeber has against the United States Mining Corporation for commissions due for the sale of stock of said company, which the said Bentley M. McMullin agrees to do with due diligence; in consideration of which the said R. F. Graeber agrees to pay Bentley M. McMullin a fee of two hundred fifty dollars cash retainer and in addition the sum of twenty-five per cent. of all sums collected from said company if collected without suit and if collected by court action then forty per cent. thereof, in full for all services heretofore and hereafter performed, in connection therewith."

The claim of Graeber against the United States Mining Corporation was submitted to arbitration, and on May 21, 1927, a judgment on the award of the arbitrator was entered in the state court of the city and county of Denver in favor of Graeber and against the United States Mining Corporation for the sum of $89,822.18. A transcript of this judgment was filed in the records of San Juan county, Colo. McMullin also filed notices of claim of lien on the judgment for his fees, one with the clerk of the court in Denver and one in the records of San Juan county, pursuant to and in conformity with the statutes of the state of Colorado relating to attorney's liens. Later an execution was issued on the judgment and four groups of mining claims were in November, 1927, sold by the sheriff of San Juan county as the property of the United States Mining

Corporation. The mining claims were bid in by Graeber, the plaintiff in the suit, for the sum of $75,000. Three of these groups had been previously sold on execution by the sheriff and conveyed by him to one Edna Carpenter. Prior to the sale by the sheriff in November when Graeber bid in the groups of claims for $75,000, he had acquired the Carpenter title. It appears that one E. C. Condit and others associated with him claimed some interest in some or all of these four groups of mining claims. McMullin, after obtaining judgment for Graeber against the United States Mining Corporation, began an active campaign to adjust the conflicting interests of the parties interested in or claiming interests in these mining properties. The details of his efforts to this end need not be stated. Suffice it to say that in May, 1928, Graeber, as the fruits of his judgment against the United States Mining Corporation, had good title to the Toltec group of claims, being one of the four sold on execution and bid in by him the previous November. In the adjustments through which he secured title to this group he released all claim to the other three groups. On February 8, 1928, and while the negotiations which were consummated in May were still pending, Graeber wrote McMullin the following letter: "I hand you herewith a special warranty deed to a two-fifths interest in the Toltec group of mining claims in San Juan County, Colorado, recently acquired by me under my judgment against the United States Mining Corporation, upon which you have an attorney's lien, under the contract existing between us, for forty per cent. thereof. The inclosed deed is given to you as security for that lien, and not in extinguishment thereof, it being my intention that said lien shall remain in full force and effect until all matters connected with said company have been finally determined and settled, and until said lien has been formally released."

At some time prior to the commencement of these suits in the court below Graeber conveyed a six-tenths interest in two of the claims of the Toltec group to Martin, the plaintiff in case No. 495, and also an undisclosed part of his remaining six-tenths interest in the remaining claims of the Toltec group to Latta, coappellant with Graeber in case No. 471.

On November 2, 1929, these suits were commenced in the court below to quiet the title of the respective plaintiffs in the respective claims of the Toltec group as they were severally interested. Martin alleged a

six-tenths interest in two of the claims of the Toltec group; Graeber and Latta alleged a six-tenths interest in the remaining claims of said group. McMullin and others were named as defendants. In his answer McMullin asserted an interest in the six-tenths interest claimed by the respective plaintiffs in the said mining claims and alleged that he held an attorney's lien on said claims for the fees stipulated in the contract with Graeber of January 28, 1927. The trial court sustained this plea and entered judgment dismissing both complaints and adjudged in each case that McMullin's "attorney's lien on said property to the extent of forty per cent. (40%) of Eighty-nine Thousand, Eight Hundred Twenty-two and 18/100 ($89,822.-18) Dollars, together with interest thereon from the 21st day of May, 1927, at the rate of 8% per annum, said last named date being the date of the judgment on which lien is attached, is valid and subsisting and undischarged."

Appellee, in his brief filed in case No. 471, says:

"The crux of the matter, it seems to me, is the letter of February 8, 1928, written by R. F. Graeber contemporaneously with and accompanying the deed of that date conveying to appellee the 2/5 or 4/10 interest in the property. This letter appears at page 23 of the printed transcript of the record, and states that the deed of that date is given as security for the lien and not in extinguishment thereof, etc.

"No explanation of this letter was offered, nor can I find anything in the record which could be construed as in any way controverting the language of the letter or leading to the conclusion that the letter means otherwise than just what it says.

"I do not deem it necessary to controvert or discuss the propositions of law announced by appellants in their brief. These propositions of law are all correct, but, owing to the letter above discussed, seem to me to be entirely inapplicable here.

"Appellants, at pages 5 to 8 of their brief, discuss the proposition that there was no notice or suit to establish the lien; but, Graeber at all times and in all of his dealings in relation thereto recognized this lien. Hence, I cannot see that this formality or informality could be of any concern.

"At pages 8 to 13 of their brief appellants discuss the proposition that by accepting the deed of February 8, 1928, the appellee waived his lien; but, Graeber, by his letter of even date therewith, says that the deed was given as security for the lien and not in extinguishment thereof.

"At pages 13 and 14 of their brief the appellants discuss the proposition of the amount of the lien and other security; but, again, when we read the letter of February 8, 1928, it would seem that all of these questions are foreclosed and settled by that letter.

"So that, admitting every proposition of law announced by the appellants to be incontrovertible, we come back to the letter, and that makes them all inapplicable to the case at bar.

"To conclude, if this Court should hold, as was held below, that this deed and the letter of February 8, 1928, did not discharge the lien, this judgment must stand affirmed; if this Court should take a contrary view, the judgment should be reversed."

This statement is, in effect, repeated in his brief filed in case No. 495. This statement is made with such boldness and assurance that one is almost persuaded to accept it ex cathedra; but is it true that, "if this Court should hold, as was held below, that this deed and the letter of February 8, 1928, did not discharge the lien, this judgment must stand affirmed; if this Court should take a contrary view, the judgment should be reversed"? An analysis of the record, including this letter, persuades that the decision of these cases is not so simple as that stated by appellee. In respect to the deed conveying to him the four-tenths interest in the claims of the Toltec group McMullin as a witness testified:

"Relative to the transaction of February, 1928, in which witness was given a quitclaim deed to two-fifths interest in the Toltec property, stated they held under the agreement of December 17, 1927, an agreement between Graeber, Van Ness and the United Operating Trust, Van Ness had agreed to get the approval of a large percentage of the stockholders of the United States Mining Corporation to the transaction by which Graeber would be allowed the Toltec group of claims upon his judgment. That meeting was held on January 28, 1928, in Denver, and following the meeting, Graeber was preparing to leave Denver and go somewhere in the East. He came to the office of witness a few days before the agreement and said he wanted to give him a deed to a two-fifths interest.

"Witness told him he would be glad to get the deed. That was the first time the deed had been mentioned. He came back

a couple of days later and gave him the deed."

It is significant that in this testimony McMullin made no mention of the letter which he relies upon to sustain the judgments in these cases. In the above statement quoted from his brief appellee has truly said: "No explanation of this letter was offered." Assuming without deciding that there was a consideration sufficient to give this letter the binding effect claimed for it, whose duty was it to explain? At the time it was written McMullin was Graeber's attorney and in the letter Graeber, as McMullin now claims, made statements which irrevocably fastened his attorney's lien upon the entire fee of the Toltec group of claims. What conditions occasioned the writing of the letter? Did McMullin explain to him that if the Toltec group of claims for which they were then negotiating were acquired in satisfaction of Graeber's judgment against the United States Mining Corporation, the entire fee in said mining claims, with this letter outstanding, would be charged with the lien of his attorney's fees amounting at that time in round numbers to $36,000?

█ It is, we believe, uniformly held that an attorney relying upon a contract made with his client, under conditions such as existed at the time this letter was written by Graeber, must show that he made full disclosure to his client to obtain a decree of a court of equity sustaining the validity of the contract and enforcing it. Ransom v. Ransom, 70 Misc. Rep. 30, 127 N. Y. S. 1027, 1032; Keenan v. Scott, 64 W. Va. 137, 61 S. E. 806; Vance v. Ellison, 76 W. Va. 592, 85 S. E. 776; Waterbury v. Laredo, 68 Tex. 565, 5 S. W. 81; Dickinson v. Bradford, 59 Ala. 581, 31 Am. Rep. 23; Newman v. Davenport, 9 Baxt. (Tenn.) 538.

In Ransom v. Ransom, supra, the court said: "Plaintiff has come into a court of equity, and he can obtain a decree for so much only as equitable doctrines permit. He seeks to enforce a contract with a client, and 'is bound to establish affirmatively that it was made by the client with full knowledge of all the material circumstances known to the attorney and was in every respect free from fraud on his part or misconception on the part of the client, and that a reasonable use was made by the attorney of the confidence reposed in him. The general principle is firmly established and universally recognized.' "

Also the following from Story's Equity Jurisprudence, § 311: "On the one hand it is not necessary to establish that there has been fraud or imposition upon the client; and, on the other hand, it is not necessarily void throughout, ipso facto. But the burden of establishing its perfect fairness, adequacy, and equity is thrown upon the attorney. * * * If no such proof is established, courts of equity treat the case as one of constructive fraud."

In Dickinson v. Bradford, supra, the court said: "The relation of an attorney to his client is one of trust and confidence, in which influence is of necessity acquired. The law does not incapacitate him from contracting with, or from becoming the recipient of the bounty of the client. It does, however, command that all his transactions with the client shall be anxiously and jealously scrutinized, that the client may be protected from his own overweening confidence, and from the influence or ascendency which the relation generates.—1 Story's Eq. §§ 310–314; 2 Lead. Eq. Cases (4th Am. Ed.) 1216. There may be no trace of deceit, or of imposition, or of overreaching advantage—no mark of actual fraud, which would justify a court in interfering for the rescission, or in refusing to compel performance, if the contract had been made between persons not sustaining a relation in which confidence was reposed, and influence acquired. The court does not interfere, or refuse interference, because there has been deceit, or imposition, or actual fraud, but independent of such facts and ingredients, upon considerations of public policy, to prevent fraud, an abuse of confidence and influence, and to compel fidelity and unselfishness in the performance of fiduciary duties."

█ In the discussion so far it has been assumed that the meaning of the language used in the Graeber letter is as claimed by appellee. As a matter of fact, the meaning to be given the language used in the letter is by no means clear. It is possible to attribute this meaning to the language used, namely, that the attorney's lien of McMullin should be kept in existence until a clear title had been obtained to the Toltec group of claims, when the judgment and with it the lien would be released and satisfied; that pending the acquisition of such title the deed conveying to McMullin a four-tenths interest in the Toltec group of mining claims should be regarded as security for his attorney's fees; that the deed should be regarded and accepted as payment of his fees after title to said claims had been acquired. That such is the meaning is not improbable or unrea-

sonable in view of appellee's attitude in previous negotiations.

Under the authorities, as we have seen, McMullin, because of the existence of the relation of attorney and client between himself and Graeber at the time the letter was written, may not invoke the language of the letter to obtain a decision of these cases in his favor. On the other hand, a decision against him ought to be based upon something more substantial than mere self-serving declarations contained in the letter, even though the meaning above suggested should be accepted.

As to the statutory attorney's lien:

The statute of Colorado respecting attorneys' liens (section 6010, Compiled Laws 1921) provides: "All attorneys and counselors-at-law, shall have a lien * * * on any judgment they may have obtained, * * * for any fees * * * due or to become due from any client. * * * In the case of judgments obtained * * * by any attorney, such attorney may file with the clerk of the court wherein such cause is pending, notice of his claim as lienor, setting forth specifically the agreement of compensation between such attorney and his client, or clients, which notice, duly entered of record, shall be notice to all persons and to all parties, including the judgment creditor," etc.

It will be observed that the first paragraph of the section of the statute above quoted gives the attorney a lien on the judgment for his fees without qualification. The second paragraph provides in what manner constructive notice may be given to all persons, including the judgment creditor. It must be kept in mind that this litigation is between the judgment creditor Graeber and his grantees on the one side, and McMullin, attorney for Graeber, the judgment creditor, on the other side.

An earlier act of the Legislature of the State of Colorado giving attorneys a lien for their fees did not contain the second paragraph of the section above quoted. Referring to the first paragraph of the above section as the statute then stood, the Supreme Court of Colorado in Boston & Colorado Smelting Company v. Pless, 9 Colo. 112, 10 P. 652, 653, said: " * * * This lien attaches to the judgment at once upon its recovery, as between attorney and client, so that nothing more is necessary prior to the enforcement thereof against the latter by proper action."

In Johnson v. McMillan, 13 Colo. 423, 22 P. 769, 770, the Supreme Court of the state said:

"The section of the statute upon which the action is founded reads as follows:

" 'All attorneys and counselors at law shall have a lien upon any money or property in their hands, or upon any judgment they may have attained (obtained), belonging to any client, for any fee or balance of fees due, or any professional services rendered by them in any court of this state; which said lien may be enforced by the proper civil action.' Gen. St. c. 6, § 17. Appellants having obtained for their client, Murray, the judgment against Nye, the statute immediately invested them with a lien thereon to the extent of their reasonable fees, remaining due and unpaid, for professional services rendered by them in obtaining the same. As between appellants and their client, nothing remained to be done to render such lien complete."

In Fillmore v. Wells, 10 Colo. 228, 15 P. 343, 347, 3 Am. St. Rep. 567, that court said:

"The attorney's lien, whether under the statute or at common law, is equitable in its nature. Even the decisions in this country, which confine its existence and application to the narrowest limits, always speak of it as an equitable lien, right, or privilege. It is not property in the thing which gives a right of action at law. It is a charge upon the thing which is protected in equity. Courts of law may recognize it when the res is in possession of the lienor, and the owner is seeking to deprive him of such possession. But where the thing is not in possession, and some affirmative action is required by the attorney, he, like other lien claimants, must seek relief in equity. In some instances, a formal suit should be instituted; in others, an application to the court rendering the judgment, for the proper order, would be sufficient.

"The main purpose of plaintiffs in this case is to utilize their lien by subjecting, through it, the rents and real estate, if need be, recovered by their exertions, to the payment of their claim for services. Since the employment by the different guardians, and the amount of compensation, are controverted matters, it becomes incidentally necessary to investigate and determine these questions. If plaintiffs intruded themselves into the cases without employment, and their voluntary services were objected to and repudiat-

ed, or if they have been paid all those services are reasonably worth, the statute gives them no lien. But, since a court of equity is the only forum that can enforce by proper decree the lien rights, we are of opinion that this is one of the cases wherein such court may take and retain jurisdiction for all purposes."

Again in Bell v. Board of Com'rs of Lake County, 26 Colo. App. 192, 141 P. 861, 864, that court said:

"Her agreement with plaintiff for a fee of 20 per cent. of the judgment when collected was within her power as such trustee, and operated as an equitable assignment thereof pro tanto to plaintiff, and gave him a claim upon the specific fund for the payment of his fee. Patten v. Wilson, 10 Casey (34 Pa.) 299; Terney v. Wilson, 45 N. J. Law, 282, 284; Ely v. Cooke, 28 N. Y. 365; Williams v. Ingersoll, 23 Hun (N. Y.) 284.
* * *

"That a contract between attorney and client for payment of the attorney out of the judgment recovered or to be recovered operates as a binding equitable assignment of that fund pro tanto, and creates a lien upon the specific fund, is clearly held in Terney v. Wilson, supra, citing Ely v. Cooke, and Williams v. Ingersoll, supra, and other authorities."

Counsel for appellants, at least in argument, concede that appellee had a statutory lien for his fees on the judgment of Graeber against the United States Mining Company, but they contend it never attached to the mining claims, or could do so.

They also contend that appellee waived his lien by negotiating the settlement, whereby the mining claims were accepted in satisfaction of the judgment. Numerous authorities are cited in support of these contentions.

■ What difference does it make whether his statutory attorney's lien is valid and outstanding, or whether it is not? The subject-matter of this litigation is the fruits of the Graeber judgment. Graeber acquired these mining claims through the efforts of McMullin, his attorney. McMullin asserts his fees have not been paid. It is against this claim of McMullin that appellants are seeking to quiet their title in the mining claims. In a court of equity under such conditions McMullin's rights are as secure without a statutory attorney's lien as they are with one.

In Louisville, etc., Railroad Company v. Wilson, 138 U. S. 507, 11 S. Ct. 405, 407, 34 L. Ed. 1023, the Supreme Court of the United States said: "We think it may fairly be held that the party who takes the benefit of such a service ought to pay for it, and that equity may properly decree payment therefor. As justly remarked by Lord Kenyon in Read v. Dupper, 6 Term R. 361, 'the principle has long been settled that a party should not run away with the fruits of a cause without satisfying the legal demands of his attorney, by whose industry and expense these fruits were obtained.' In Renick v. Ludington, 16 W. Va. 378, 392, it is said: 'The lien (even in cases of quantum meruit) is in the nature of an equitable lien (Vanleer v. Vanleer, 3 Coop. [Tenn.] Ch. 23), and is based on the natural equity that the plaintiff ought not to be allowed to appropriate the whole of a judgment in his favor without paying thereout for the services of his attorney in obtaining such judgment.' See, also, Mahone v. Southern Tel. Co. [C. C.] 33 F. 702, and In re Paschal, 10 Wall. 483 [19 L. Ed. 992]. We think, therefore, there was no impropriety in allowing intervenor $300 for these services."

■ Granting that McMullin did not accept the deed from Graeber conveying to him a four-tenths interest in the mining claims as payment or in satisfaction of his attorney's fees, the matters for our determination are the measure of his fees and the quality of the security held by him for their payment. In the determination of these matters the contract of January 28, 1927, is controlling. It fixes the rights of McMullin and the obligations of Graeber and his grantees with notice. The contract provides that McMullin shall receive a fee of $250 cash retainer and "in addition the sum of 25% of all sums collected from said company if collected without suit, and if collected by court action, then 40 per cent. thereof." The contract clearly indicates that both attorney and client had in mind the collection of the claim in money. The fact is not one dollar in money was ever collected. The payment actually made was the transfer of the mining claims. These Graeber received in lieu of money in payment of the judgment after much negotiation and effort on the part of McMullin. Although no money was collected as contemplated by the contract it would not be equitable or just to hold that McMullin should not be paid anything for his services.

Under the decree of the trial court McMullin is given a lien upon the six-tenths interest of the appellants in all of these mining claims for his attorney's fees payable in money which at the present time amounts

to almost fifty thousand dollars. With that decree standing appellee may in a proper proceeding foreclose his lien and sell the entire fee, that is, the six-tenths interest of appellants and the four-tenths interest held by himself in all of these mining claims in satisfaction of his attorney's fees—leaving Graeber empty-handed. Under the contract would this outcome be just and fair? We do not think so.

There is no evidence in the record as to the actual or probable value of these mining claims at the time they were acquired by Graeber in May, 1928, or since. It is possible, and indeed probable, that these claims at no time since the date of appellee's contract of employment, in January, 1927, could have been sold in cash for the amount of appellee's attorney's fees which in May, 1928, amounted in round numbers to $36,000 and now in round numbers to $50,000. Since the judgment against the mining company was not collected in cash but was paid by the transfer of the Toltec group of mining claims, what attorney's fees in equity and good conscience, under his contract, is appellee entitled to? He negotiated the settlement of the judgment and is entitled to his share in the fruits of the settlement which in equity and good conscience, it seems to us, is a four-tenths of the reasonable, fair cash value of these mining claims. Of course he is not required to accept four-tenths interest in the mining claims as payment of his fees. He may not be willing to become a tenant in common or joint owner of the claims with Graeber and his grantees. It may be neither his inclination nor his interest to spend money in their development. But, on the other hand, he certainly is not entitled to more than four-tenths of their reasonable value. Such value might be arrived at in various ways: The mining claims might be partitioned and the part representing appellee's interest sold and the proceeds applied in satisfaction of his fees; the entire fee might be sold and the proceeds of the sale distributed; an undivided four-tenths interest in the mining claims might be sold and the proceeds applied in satisfaction of his fees. If the mining claims were of a fairly uniform value like a tract of farming or range land, the method by partition would be practical and fair. If the mining claims, like a city residence, constituted an indivisible property, the whole fee should be sold and the proceeds distributed. But since they are a number of mining claims of uncertain value, the undivided interest representing appellee's attorney's fees may, we

have no doubt, be sold and applied in satisfaction of his fees without injury to either appellants or appellee. Since the 8th of January, 1928, McMullin has had in his possession a deed to a four-tenths interest in these claims. For nearly four years it has been within his power at any time to sell this four-tenths interest conveyed to him by this deed and obtain his fees in money and receive in cash all that in equity and good conscience he is entitled to under his contract. Whether he shall ever do so is, of course, a matter over which appellants have no control. They are entitled, however, to have the matter of his fees declared a closed transaction, not because as claimed by them he accepted the deed in payment of his fees, or because, as they claim, he waived his statutory attorney's lien, but because he now has it within his power to convert into money an undivided four-tenths interest in these mining claims and receive in cash all he is entitled to under his contract. His statutory attorney's lien, valid and subsisting though it be, can give him no more. In view of these conclusions there appears to be no valid reason why the title of appellants should not be quieted to the remaining six-tenths interest standing in their names against the asserted claim of appellee.

The decree of the court below will be vacated and set aside, and a decree entered quieting the title of the appellants in each of the cases as prayed for in the complaints. Appellants are allowed their costs.