Norman M. LITTELL

v.

Rogers C. B. MORTON, the Secretary of
the Department of the Interior of the
United States.

Civ. A. No. 19917–W.

United States District Court,
D. Maryland.

Jan. 14, 1974.

412

Marvin J. Sonosky, Washington, D. C., for plaintiff; Richard W. Case, Smith, Somerville & Case, Baltimore, Md., of counsel.

George Beall, U. S. Atty., D. Md., Baltimore, Md., Herbert Pittle, Dept. of Justice, Washington, D. C., for defendant.

WATKINS, Senior District Judge:

Plaintiff, Norman Littell, has sued defendant, the Secretary of the Interior, in the Secretary's official capacity as the trustee for the Navajo Tribe of Indians, for amounts claimed to be due under a contract plaintiff had with the Navajo Tribe for legal services. Jurisdiction is based upon 28 U.S.C. § 1331(a), 1391(e) (1970) and 5 U.S.C. § 704 (1970).

This case has followed a long and tortuous path before reaching the present stage, and a summary of the background of the dispute and earlier proceedings is important to an understanding of the issues now before this Court.

Plaintiff originally entered into a contract with the Navajo Tribe in 1947 to serve as both its general counsel and claims attorney. The initial contract terminated in 1957, at which time a new contract, to last an additional ten years, was entered into. Under the terms of this new contract, plaintiff was to continue in his dual capacity as general counsel and claims attorney. As general counsel for the Tribe plaintiff received a fixed fee for handling current and routine legal work. The contract also provided for assistant general counsel who were paid fixed salaries. In his capacity as claims attorney, the contract provided that plaintiff would be paid ten percent of any money or of the value of the property he "recovered, saved, or ob-

tained" by preparing, investigating and prosecuting "claims . . . against the United States . . . relating to . . . lands which the United States is under obligation to make available" to the Navajo Tribe. To obtain compensation for any claims work, plaintiff was required to have prosecuted successfully the case. The provisions of the general counsel contract explicitly provided that the duties and functions of the *assistant general counsel* were not to include services related to claims. The statute governing Federal supervision of tribal activities required that such a contract be approved by the Secretary of the Interior in his capacity as overseer of tribal interests. 25 U.S.C. § 81 (1970). In compliance with this, the Secretary's approval was obtained.

Apparently plaintiff's relationship with the Tribe was cordial until early 1963. At that time a tribal election was held for the office of Tribal Chairman.[1] A hotly contested campaign developed, and a part of the victorious candidate's platform had been the promise to remove Mr. Littell from his position as the Tribal attorney. The newly elected Chairman claimed Mr. Littell had been exerting too much influence on non-legal affairs of the Tribe, and that certain of Mr. Littell's activities had been improper and should be investigated.[2]

After his election, the new Chairman met an obstacle in fulfilling his pledge to remove Mr. Littell as Tribal attorney.

The 1957 contract provided that the termination of the contract could be accomplished only by a majority vote of the Tribal council, and a majority of the Council's membership opposed termination of plaintiff's services. The Chairman took his problem and complaints to the then Secretary of the Interior. Following this meeting, the Chairman then had the Tribal Council's Advisory Committee (a committee hand-picked by the Chairman) adopt a resolution calling for the Secretary to investigate, audit and terminate the plaintiff's contract. The Secretary had his solicitor make a study of the records relating to plaintiff's contract with the Tribe. The solicitor determined the alleged "claim" of Healing v. Jones to be general counsel work; and, that attorneys for claims work were to be paid for by plaintiff, therefore any recovery plaintiff did receive from proper claims work should be set-off by the value of the work of general counsel used on such "claims". With this recommendation the Secretary called plaintiff to his office and requested that plaintiff resign as general counsel but retain his position as claims attorney.[3] Plaintiff refused this suggestion. Based upon these events, the Secretary notified plaintiff, in November of 1963, that the *general counsel* contract would be terminated unless plaintiff adduced evidence refuting the charges that he had been guilty of misconduct in his relations with the Tribe.

---

1. At the time in question, the Navajo governing body consisted of: the Tribal Council, seventy-four delegates elected every four years from within districts; the Chairman of the Council, also elected every four years; and, the Advisory Committee, a nine member body appointed by the Chairman.

2. These alleged activities included: obtaining an amendment to the 1957 contract by which plaintiff's annual salary was increased, contrary to specific provisions of the contract; and, obtaining an amendment to the contract classifying certain cases to be "claims", thereby entitling plaintiff to a contingency fee, when in fact they were not properly claims.

3. When the solicitor of the Department of Interior was asked by Judge Sirica, during trial before the United States District Court for the District of Columbia, why, when plaintiff was accused of such fraudulent acts, the Secretary offered to let plaintiff remain in his position as claims attorney, the solicitor replied it was felt by the Secretary that the plaintiff would have less influence over the Tribe in this position. This would tend to indicate that much of the reason plaintiff's dismissal was sought, was for political rather than for legal reasons. *See* testimony of Solicitor Barry, Joint Appendix on Appeal Before the United States Court of Appeals for the District of Columbia Circuit at 1749–53 [hereinafter cited as *Joint Appendix*].

Plaintiff did not reply but obtained from the United States District Court for the District of Columbia a preliminary injunction barring any interference with his general counsel contract pending the outcome of the litigation and this was upheld by the Court of Appeals for the District of Columbia Circuit. 119 U.S.App.D.C. 197, 338 F.2d 537 (1964). The suit was tried on the merits and as a result the court, by Judge Sirica, made 118 findings of fact and granted a permanent injunction. 242 F.Supp. 635 (D.C.D.C.1965). The District Court held that the Secretary lacked authority to terminate plaintiff's contract. Among the findings, however, was the finding that plaintiff had "sometimes used and condoned the use of general counsel attorneys on claims litigation." 242 F.Supp. at 660, Fdg. 59. In connection with this finding, Judge Sirica stressed that this use of general counsel had not been with an evil intent and was often unavoidable.[4] Based upon this one finding, the Circuit Court of Appeals for the District of Columbia Circuit, reversed the lower court, and held that the use of tribal staff attorneys on claims cases in violation of the contract constituted a breach adequate for the cancellation of the general counsel contract. 125 U.S.App.D.C. 89, 366 F.2d 668 (1966), cert. den., 385 U.S. 1007, 87 S.Ct. 713, 17 L.Ed.2d 545 (1967).

Plaintiff next filed a claim for compensation with the Secretary seeking payment for services as general counsel for a period prior to the final determination of his injunctive litigation and seeking his contingent fee with respect to certain "claims" cases in which he had allegedly obtained a substantial benefit for the Tribe. The Secretary denied plaintiff's claim for payment for services as general counsel ruling that the contract had been terminated as of December, 1963, so that plaintiff was not entitled to payment for services rendered thereafter. As for the "claims" cases the Secretary ruled that several of these were not claims at all and the remainder, although claims, were not to be paid on the ground plaintiff had breached his fiduciary duty to the Tribe, thereby forfeiting his right to a fee.

Plaintiff then instituted his action in this Court.[5] The following amounts are claimed by plaintiff:

(1) the sum of $18,023.70, representing the amount remaining due for services and expenses rendered under plaintiff's former general counsel contract with the Navajo Tribe;

(2) the sum of $25,009.76 with interest, representing fees earned by plaintiff for representing the Navajo Tribe in what is referred to as the *Helium Case*;

(3) ten percent of the value of two million acres of land, which plaintiff alleges were recovered for the Navajo in the case of Healing v. Jones; and

(4) in the event of ultimate success in a proceeding still pending before the Department of the Interior, *Utah 030009*, plaintiff's proportionate share of ten percent of

---

4. Judge Sirica stated: "Plaintiff encountered shortages in legal personnel and difficulty in training young lawyers coming to Window Rock, Arizona, in the intricacies of Indian law and Indian affairs. The plaintiff has sometimes used and condoned the use of general counsel attorneys on claims litigation." 242 F.Supp. at 660, Fdg. 59. However, with this finding the court still stated: "From all of the evidence, the Court cannot find any act of intentional misconduct or inexcusable negligence which would close the door of equity on Mr. Littell." *Id.* at 642. The court later stated: "The plaintiff has

at all times represented his client competently, faithfully, loyally and honestly." *Id.* at 644.

5. Summary judgment was initially granted the defendant by this Court on the basis of sovereign immunity. 314 F.Supp. 1176 (D. Md.1970). However, this was reversed by the Court of Appeals for the Fourth Circuit, which held that the Secretary's decision was reviewable under the Administrative Procedure Act, and that sovereign immunity did not exist. 445 F.2d 1207 (4 Cir. 1971).

the value of the land which may be recovered.

Defendant alleges that plaintiff forfeited any claim to further fees of any kind by virtue of his breach of trust, and defendant affirmatively denies that Healing v. Jones and *Utah 030009* were "claims" under the provisions of plaintiff's contract. Additionally, defendant counterclaims for the value of the services of general counsel used on claims work in contravention of the terms of the contract, and for $104,398.19, representing installment payments, made by defendant to plaintiff, under the general counsel contract from the time of the preliminary injunction until the permanent injunction was dissolved.

■ A substantial portion of this case involves a review of an administrative decision under the Administrative Procedure Act. 5 U.S.C. § 701 et seq. (1970). The APA limits the scope of judicial review a court may make of an administrative determination. The courts are not to "interfere with administrative determinations unless, upon the record, the proceedings were manifestly unfair, or substantial evidence to support the administrative finding is lacking, or error of law has been committed, or the evidence reflects a manifest abuse of discretion." United States ex rel. Rongetti v. Neely, 207 F.2d 281, 284 (7 Cir. 1953). The specific application and effect of this limited review upon the instant action will be discussed at length near the conclusion of this opinion.

I

RELIEF SOUGHT

The initial problem to be faced in determining the merits of this suit, is whether the three litigative actions, in which plaintiff represented the Navajo Tribe, were "claims" cases, and, if so, is plaintiff entitled to recover on them. The first of these, Navajo Tribe of Indians v. United States, 364 F.2d 320, 176 Ct.Cl. 502 (1966) [the *Helium Case*], is conceded to be a claims case and plaintiff would be entitled to his $25,009.76 contingency fee if no outstanding claims by defendant existed. However, in the remaining two actions defendant denies that they are "claims" as defined by the Attorney Contract. The answer to this principally revolves around the wording of the contract. As contained within the contract, the duties of the claims counsel were:

> to investigate and formulate any and all claims of the said Indians *against the United States* and officers thereof, *including* claims arising out of violations of the treaty between the United States and the Navajo Tribe of Indians . . . and *claims relating to the taking of, or failure to make available to said Indians, lands which the United States is under obligation to make available to said Tribe and which said Tribe had the legal and/or equitable right to own, possess, or use.*
> [Emphasis added]

HEALING v. JONES

■ The first of these disputed actions was the culmination of a long and bitter territorial dispute between the Hopi Tribe and the Navajo Tribe. By Executive Order in 1882 a parcel of about two and one-half million acres was set aside for the Hopi and "such other Indians" as the Secretary of the Interior may see fit to "settle" thereon. This Executive Order vested no property rights in the Hopi since the President has no power to give away Federal property to Indians unless authorized by Congress. Sioux Tribe v. United States, 316 U.S. 317, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942). The Hopi were located within the bounds of this land at the time of the order. At the same time, a few Navajo were also located on the land. Subsequently, a substantial number of Navajo tribesmen began to enter the land and settle thereon. Friction developed between the two tribes over the use and ownership of the land, and the various Secretaries of the Interior were unable to resolve the conflict. This led to the enactment of a statute, Act of

July 22, 1958, 72 Stat. 403, to "determine the rights and interests of the Navajo Tribe, Hopi Tribe, and individual Indians to the area set aside by Executive Order of December 16, 1882. . . ." The statute declared the lands:

> to be held by the United States in trust for the Hopi Indians and such other Indians, if any, as heretofore have been settled thereon by the Secretary. . . . The Navajo Indian Tribe and the Hopi Indian Tribe . . . and the Attorney General on behalf of the United States, are each hereby authorized to commence or defend in the United States District Court for the District of Arizona an action against each other . . . for the purpose of determining the rights and interests of said parties in and to said lands. . . .

[Emphasis added]

As a result of this statute an action was instituted by the Hopi Tribe against the Navajo Tribe and the Attorney General of the United States to resolve the question of ownership. The Navajo Tribe then filed a counterclaim and a cross-claim. The United States initially argued that the court had no jurisdiction to hear the dispute and sought dismissal, but the court held jurisdiction did exist. Healing v. Jones, 174 F.Supp. 211 (D.Ariz.1959). The action finally terminated with a sixty-seven page opinion confirming exclusively to the Hopi approximately 500,000 acres and the remaining two million acres jointly to the Hopi and Navajo. Healing v. Jones, 210 F.Supp. 125 (D.Ariz.1962), aff'd., 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963). Plaintiff represented the Navajo throughout these proceedings.

The defendant argues that Healing is not a "claim." Emphasizing the wording of the contract describing the duties of the claims attorney as pursuing those claims "against the United States and officers thereof," defendant argues Healing was not a claim against the United States but was a claim by the Hopi against the Navajo. Defendant asserts that the United States was merely a disinterested stakeholder.

Plaintiff places his emphasis on the later phraseology of the definition of claims—"including. . . claims relating to the taking of, or failure to make available to said Indians, lands which the United States is under obligation to make available to said Tribe."

Defendant's reading of the contract seems overly restrictive. If the meaning of "claims" was to be restricted merely to those actions specifically against the United States then there would seem to have been no purpose for the subsequent verbiage. The statement that "claims" included claims for land which the United States had failed to make available to the Tribe seems to expand the meaning of "claims" beyond mere suits against the United States.[6] Healing represents an instance in which the United States had failed to make land available to the Navajo, in which they had an equitable interest in its use. The Executive Order of 1882 had set the land aside for the Hopi and "such other Indians" as the Secretary might "settle" thereon. The Secretary had failed to reach a solution of the problem as to whether the Navajo had an interest. The statute that was enacted in order

---

6. This could be viewed as against established law since, ordinarily, where there is a contract between an attorney and a client, the contract will be scrutinized very carefully. Littleton v. Kincaid, 179 F.2d 848 (4 Cir. 1950); Ridge v. Healy, 251 F. 798 (8 Cir. 1918); and the terms of the contract would then be construed most favorably for the client. However, the instant contract varies from an ordinary attorney-client contract in that it has taken an extra step with the scrutiny and approval of the Department of the Interior. This, it would seem, would not make the contract as suspect as one in which an attorney has drawn a retainer agreement with a client with no third party passing upon it.

that the dispute could be resolved in the courts still did not establish that the Navajo had any claim to the land.[7]

## UTAH 030009

■ The second disputed action, Navajo Tribe v. Utah [*Utah 030009*], concerns the issuance of a patent to the state of Utah for two sections of land. In 1894, the Enabling Act of Utah, 28 Stat. 107, granted to Utah non-mineral sections 2, 16, 32 and 36 in each township in that state for the support of schools, or equivalent public lands where such sections have been sold or "otherwise disposed of." In 1958 the state of Utah filed an application for the patent to two oil rich sections 16, and the United States Land Office held that title to these sections had vested in the State pursuant to the 1894 school grant. The Navajo Tribe filed a complaint contesting this decision, arguing that these two sections were used and occupied by Navajo Tribesmen during the relevant periods and were therefore "otherwise disposed of." The Land Office dismissed this complaint without a hearing and the Bureau of Land Management affirmed this dismissal. However, the Solicitor of the Department of the Interior remanded the proceeding for a full hearing. *See* Navajo Tribe of Indians v. State of Utah, 72 I.D. 361 (1965). These proceedings are still pending before the Secretary of the Interior. Plaintiff was counsel for the Tribe in this action up to his final termination.

Again defendant argues that this is not a claim because it was not a proceeding against the United States, but rather, it was an action between Utah and the Tribe. However, once again, if a broader reading is given to the defined claims duties, as set forth in the contract, then, if the Tribe is eventually held to have the patent in the land, and not Utah, this too would be land the Tribe had a "legal and/or equitable right to own, possess, or use" and the United States had failed "to make available to said Indians."

■■ Beyond this literal interpretation, the parties to the contract seemed to have understood that both *Healing* and *Utah 030009* were claims. The plaintiff and members of both the Advisory Committee and the Tribal Council consistently discussed the two cases, both before they were instituted and during their progression, as if they were claims.[8] Defendant has argued that because of the educational and cultural differences of the Navajo Tribal Council members, in addition to the supposed influence plaintiff had acquired through his long relationship with the Tribe, the Council members were not in a position to distinguish the difference between general counsel work and claims work. However, there seems to be little support in the record for such a contention.

Admittedly, the then Solicitor for the Secretary initially stated on November 15, 1960, that neither of these actions was a claim. *Joint Appendix* at 2039.

---

7. The statute stated that the land was held "in trust for the Hopi Indians and such other Indians, if any . . . . ."

8. The practical interpretation of a contract by the parties over a long period of time is of great influence. Old Colony Trust Co. v. Omaha, 230 U.S. 100, 33 S.Ct. 967, 57 L.Ed. 1019 (1913). Examples of a mutual understanding in the instant case can be seen in the September 14, 1957, Minutes of the Advisory Committee, in which it is recited that plaintiff asserted that if the Hopi-Navajo boundary dispute went to trial it would be a "claim." *See Joint Appendix* at 2086. On this date there was a very thorough discussion of the Hopi dispute's potential for becoming a "claim."

In the minutes of February 6, 1961, plaintiff described the compensation provision for "claims" to the Tribal Council, *Joint Appendix* at 2303, and again on May 9, 1963, plaintiff explained the functions of the claims attorney and the difference in compensation for claims. *Id.* at 2299–2300. So, the Tribal Council was apparently fully aware of the consequences of a case being a claim, and with this awareness they frequently discussed and heard discussed, both *Healing* and *Utah 030009*, as claims. *See Joint Appendix* at 297, 2294–97, 2300–02, 2304–06, 2330–37.

However, after his attention was drawn to the Advisory Committee Minutes discussing these as claims the Solicitor reversed his stand and ruled that both were claims. *Id.* at 2060. Therefore, for the above discussed reasons, it would appear that plaintiff had represented the Navajo in what were in fact three "claims" actions and would consequently be entitled to the contingency fee, subject to the resolution of the forfeiture contention made by defendant.

*General Counsel Fees for the Period of the Injunction*

On December 1, 1963, plaintiff's general counsel portion of the contract was to be cancelled by the ruling of the defendant; however, the preliminary injunction obtained by plaintiff enjoined defendant from "terminating or cancelling the contract . . . suspending or otherwise improperly interfering with the performance of the plaintiff . . . and . . . stopping or preventing the ordinary course of payment to him. . . ." During the period this injunction and the subsequent permanent injunction were in force, plaintiff continued to perform his general counsel duties for the Tribe. During this period plaintiff also received $104,398.19 in general counsel fees and expenses. On September 2, 1966, the order for the permanent injunction was vacated by the United States Court of Appeals for the District of Columbia Circuit. At this time $18,023.70 remained unpaid at contract rates for general counsel services plaintiff had performed and general counsel expenses he had advanced on behalf of the Tribe. Plaintiff now seeks payment of this amount.

The defendant refuses to make payment. Defendant argues that not only is the $18,023.70 not due the plaintiff, but that the $104,398.19 received by plaintiff is now recoverable due to the obtention of the improper injunction. Since that sum would not have been paid but for the injunction, defendant now seeks through a counterclaim, the return of the money paid during this period.

Ordinarily, without a bond, liability for the improvident issuance of an injunction is limited to costs unless malicious prosecution is shown. Greenwood County v. Duke Power Co., 107 F. 2d 484 (4 Cir. 1939), cert. den., 309 U.S. 667, 60 S.Ct. 608, 84 L.Ed. 1014; United Motors Service, Inc. v. Tropic-Aire, Inc., 57 F.2d 479 (8 Cir. 1932). However, under the principle of "restitution" a party who obtains benefits from an improperly issued injunction, that he would not have received but for the injunction, has a duty to restore that benefit to those who have been injured by the injunction. Arkadelphia Milling Co. v. St. Louis Southwestern R.R. Co., 249 U.S. 134, 145, 39 S.Ct. 237, 63 L.Ed. 517 (1918); Tenth Ward Road Dist. No. 11 v. Texas & P. Ry. Co., 12 F.2d 245 (5 Cir. 1926). *See generally,* Middlewest Motor Freight Bureau v. United States, 433 F.2d 212, 225–229 (8 Cir. 1970), cert. den., 402 U.S. 999, 91 S.Ct. 2169, 29 L.Ed.2d 165 (1971). But this doctrine is tempered in that the granting of restitution is discretionary with the court. Greenwood County v. Duke Power Co., *supra.* Restitution:

> is not of mere right. It is ex gratia, resting in the exercise of a sound discretion; and the court will not order it where the justice of the case does not call for it. . . . " 'In such cases the simple but comprehensive question is whether the circumstances are such that equitably the defendant should restore to the plaintiff what he has received.' "

Atlantic Coast Line R.R. Co. v. Florida, 295 U.S. 301, 310, 55 S.Ct. 713, 79 L. Ed.2d 1451 (1935) [Citations omitted]. In the instant case, it is true plaintiff would not have received his general counsel payments but for the issuance of the improper injunction; but, during this period he was performing general counsel services on behalf of the Tribe. The Tribe had the benefit of these services during this period and lost nothing.

Where plaintiff's actions were not those of actual malice or evil intent, and where he continued competently to perform his general counsel services, it would now be inequitable to allow the Tribe to have received these services free and to require plaintiff to reimburse defendant for the payments made during this period. Consequently, plaintiff will not be required to return the money received for general counsel services during the period of the injunction, and plaintiff is entitled to the remainder of the fees due.

## II

### BREACH OF FIDUCIARY DUTY

Defendant asserts three breaches by plaintiff of the fiduciary duty owed by an attorney to his client. These are: use of general counsel attorneys for claims work, which was specifically against the terms of the contract; the increase in plaintiff's general counsel retainer fee within five years of the 1957 contract date, which was expressly forbidden by the contract; and, improperly amending the contract to list Healing v. Jones and *Utah 030009* as claims.

### *Use of General Counsel Attorneys*

Taken individually, the first breach, the use of general counsel attorneys on "claims", was admitted by plaintiff in his testimony during the proceedings on the injunction. *Joint Appendix* at 1576–86. It was one of Judge Sirica's findings of fact in the United States District Court for the District of Columbia. 242 F.Supp. 635, 660 (Fdg. 59); and the basis upon which the Circuit Court of Appeals for the District of Columbia Circuit reversed the District Court, holding that the use of general counsel attorneys was in violation of the terms of the contract and represented a breach of the plaintiff's fiduciary duty, thereby entitling the Secretary of the Interior to rescind plaintiff's contract with the Navajo Tribe. 125 U.S.App.D.C. 89, 366 F.2d 668.

Plaintiff does attempt to justify his use of general counsel attorneys. Plaintiff explains that some of this usage was incurred when he would assign memoranda to new attorneys to introduce them to the field of Indian law. Although these memoranda were technically on claims matters, their purpose was to serve as an indoctrination, and the actual product was of little value to the claims work because it was on a matter with which plaintiff was already familiar. *Joint Appendix* 1577–79. In other instances, the use of general counsel was unavoidable,[9] or the Tribe had consented to certain general counsel being used as claims attorneys but these attorneys were used before the requisite approval of the Secretary was obtained, which approval was obtained at a later date, however.[10]

Defendant presents a tabulation, compiled by an auditor of the Bureau of Indian Affairs, that purports to show the number of days or parts of days that assistant general counsel were used on claims. Many of these tabulations are, at best, rather dubious. The auditor explained that he obtained these statistics by reading the attorneys' service records and marking every entry of a claims

---

9. An example of this was an instance where, while the trial on Healing v. Jones was in progress, plaintiff needed written statements of certain Tribesmen. Because of a snowstorm, there were no authorized claims attorneys available; however, several general counsel had come to the trial to observe the proceedings. Because of the storm these general counsel could not leave and, due to the immediate need of these written statements, plaintiff used these general counsel to take the statements. *Joint Appendix* at 1581–83.

10. Defendant, in his brief, states that attorneys McPherson and Wolf respectively devoted part or all of one hundred seventy-four (174) days and thirty-two (32) days prior to July 1960 on claims work. Defendant's Brief at 30. However, on January 8, 1960, the Tribal Council passed a resolution authorizing these two attorneys to do claims work. This resolution required approval by the Secretary, which was not obtained until July. During this period the Tribe, having approved the attorneys for claims, was aware of such usage. *Joint Appendix* 299–302.

case as constituting claims case work for the entire day. *Joint Appendix* at 1224–25. Two problems arise from this procedure however. First, every entry suspected of representing claims work was marked by the auditor as devotion by the attorney of "part or all of" a day on claims work. Therefore, four hours of research on a claims memorandum or a five minute phone call would each be represented equally as a "day or part of a day" on claims. Secondly, the method used by the auditor in determining what represented a claim was defective. In the case of *Utah 030009*, for instance, the auditor admitted that he marked every entry to the "Utah School Section problem" as claims work. *Joint Appendix* at 1225–26. However, there were five pending Utah School section cases, only two of which are alleged to be claims. Therefore, the auditor's compilation would include any work on the three general counsel school section cases. Likewise, the auditor marked any reference to "helium" as being claims work on the *Helium Case,* when, in fact, at least some of the references were to general counsel work on helium rates under tribal leases; also, any reference to the Hopi-Navajo dispute was marked as work on Healing v. Jones [11] when some of these referred to individual Tribesmen's disputes stemming from the controversy.

However, even considering these discrepancies and excuses, there are still unexplained entries of claims work on the general counsels' service records.[12] It would therefore seem that, although not on a large scale, plaintiff was using general counsel on claims, in breach of his contract.

•

*Increase in Salary*

The second alleged instance of fraud was the increase in plaintiff's salary, in contravention of the terms of the contract. The 1957 contract established plaintiff's general counsel salary to be $25,000.00 per year, with the provision "that there shall be no change in the compensation of Mr. Littell . . . during the first five years of this contract." This provision was inserted at the Secretary's request. *Joint Appendix* at 48–49. On June 30, 1961, almost four years after the contract was made, the Tribal Council voted to increase plaintiff's salary by an additional $10,000.00. *Joint Appendix* at 133–34. This resolution was sent to the Secretary for approval. Accompanying the resolution was a memorandum explaining the Council's action. As part of its justification the Council stated:

The rapidly expanding activities of the Navajo Tribe place a heavy burden on the Legal Division. The work load has increased to such an extent that it is not reasonable to expect, and the Tribe does not expect, those men to work the hours they do work, carry the responsibilities they do carry and produce the results which their efforts have yielded to the Tribe without an

---

11. An interesting bit of irony is the fact that part of defendant's argument in the District of Columbia courts and here is that plaintiff breached his fiduciary duty by using general counsel attorneys on the case of Healing v. Jones, therefore, the defendant argues, he was justified in cancelling plaintiff's contract and in refusing to pay plaintiff any contingency fee based on claims work. Yet, at the same time, defendant is arguing *Healing* was never a claims case.

12. Not all of the service records and vouchers presented by the defendant in the earlier trial are now available for review. At the pretrial conference it was agreed that the compilation of the auditor was to be accepted as prima facie correct, with a right to object by plaintiff to any entry he considered not properly supported by the underlying vouchers. Defendant was to furnish copies of these vouchers and records; however, in a memorandum dated March 1, 1972, the Deputy Commissioner of Indian Affairs reported only a part of the records were available and there was "little hope of finding more." In total, approximately forty percent of the records have been lost by defendant.

increase in the compensation paid them.

It is the considered and often expressed opinion of members of the Navajo Tribal Council . . . that to a very large extent the success which the Tribe has enjoyed in the profitable development of its resources and expansion of its activities is largely the result of the skill and endeavors put forth on its behalf by members of the legal staff.

*Joint Appendix* at 2342–43.

After four months consideration, this amendment was approved by the Secretary. *Joint Appendix* at 2398–99.

 The fact that this increase was contrary to a contract provision would not necessarily be a breach. Parties are free to modify an agreement by altering or adding provisions. Byers Transportation Co. v. Fourth National Bank & Trust Co., 333 F.2d 822 (10 Cir. 1964); Fraser v. Magic Chef-Food Giant Markets, Inc., 324 F.2d 853 (6 Cir. 1963). And a provision in a contract forbidding modification may be revoked by a new agreement contradicting it. Wiener v. Compagnie Generale Transatlantique, 61 F.2d 893 (2 Cir. 1932).

 The defendant contends that plaintiff breached his trust by not telling the Tribe, at the time the increase of salary was proposed, that the contract forbade such an increase. It is generally recognized that an attorney must make full disclosure to a client. Graeber v. McMullin, 56 F.2d 497 (10 Cir. 1932). In *Graeber* the court stated that it is:

uniformly held that an attorney relying upon a contract made with his client . . . must show that he made full disclosure to his client to obtain a decree of a court of equity sustaining the validity of the contract and enforcing it.

. . . . . .

'On the one hand it is not necessary to establish that there has been fraud or imposition upon the client; and, on the other hand, it is not necessarily void throughout, ipso facto. But the burden of establishing its perfect fairness, adequacy, and equity is upon the attorney. * * * If no such proof is established, courts of equity treat the case as one of constructive fraud.'

56 F.2d at 500. Plaintiff's response, at the trial, to the allegation that he failed expressly to inform his clients, when they were considering increasing his salary, that by increasing the salary they were changing a provision of the contract, was:

It is a matter of some concern to me that that [the provision of the contract precluding any increase in salary for five years] wasn't specifically stated, although it woud have made no difference whatsoever.

The Council has the power to change any contract and amend any contract it has.

*Joint Appendix* at 1365. Plaintiff's only presented excuse for not informing the Council of this provision was that "[t]here were so many who knew it. . . ." *Id.* There is no indication in the record, one way or the other, on the general knowledge within the Tribal Council of this provision. However, this defense appears to be an afterthought by the Secretary, since he approved the change without question.

### *Amending Contract to List New "Claims"*

 The third and final alleged fraud was the alleged improper inclusion, within an approved amendment to the contract, of a provision declaring both Healing v. Jones and *Utah 030009* to be claims. This amendment developed from a Tribal Resolution dated April 20, 1962. This resolution contained provisions authorizing the employment of a new attorney and the increase in salary

of another attorney. Without bringing it specifically to the attention of the Council, plaintiff inserted an additional part listing the two cases as claims issues. Plaintiff states that this insertion was not made to transform these two cases from general counsel work to claims work, but, rather, that it was merely for federal income tax purposes. The Internal Revenue Code of 1954, section 1301 did provide that if thirty-six months or more elapsed between the first employment and the payment for services, the fees could be spread back over the life of the employment provided at least eighty percent of the compensation from the employment was paid in a single tax year. Internal Revenue Code of 1954, § 1301. This section was subsequently changed by the Revenue Act of 1964. However, the spreadback method of the 1954 Act was still to apply to work commenced before February 6, 1963. Revenue Act of 1964, 78 Stat. 19, 106, § 232(g)(2). Plaintiff alleges that it was only for the spreadback coverage that the two cases were inserted.

In the original 1957 contract there were five "claims" cases listed, and in a meeting before the Advisory Committee plaintiff explained this insertion was for tax purposes. *Joint Appendix* at 2082. There seems to be little reason to believe or no indication, beyond defendant's allegations, that this additional insertion in 1963 was for any other purpose; and, as it has been concluded that these were in fact properly claims cases, the stated reason for their insertion is certainly plausible.

13. Review of administrative decisions is limited to the record with no de novo review. Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L. Ed. 626 (1942). In the instant action the review of the administrative record has presented a formidable task with the principal record consisting of a five-volume, 2700 page bound joint appendix embodying the transcript and exhibits presented during the trial before the United States District Court for the District of Columbia.

## III

## REVIEW OF AN ADMINISTRATIVE DETERMINATION

■ A major portion of this controversy involves the review of an administrative agency's final determination.[13] The Secretary, in refusing to make the payments allegedly due the plaintiff, essentially made three determinations that are now the subject of this Court's review. These were:

(1) that the plaintiff committed fraudulent acts against his client, thereby breaching his fiduciary trust to the client;

(2) that the alleged "claims" were, by the contract, general counsel services; and,

(3) that the fraudulent acts of the plaintiff served as a forfeiture of any fees due.

The United States Court of Appeals for the Fourth Circuit has previously determined that the facts of this controversy are appropriate for administrative review under the provisions of section 10(e) [14] of the Administrative Procedure Act. 445 F.2d 1207, 1211 (4 Cir. 1971). The court there stated that the Secretary's decision would be an abuse of discretion if it were made without a rational explanation, inexplicably departed from established policies or vested on other considerations that Congress could not have intended to make relevant. The parties have further agreed, at the

14. Section 10(e) reads: To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The review court shall—

. . . . .

(2) hold unlawful and set aside agency actions, findings, and conclusions found to be —(A) arbitrary, capricious, *an abuse of discretion, or otherwise not in accordance with law.* 5 U.S.C. § 706 (1970) [Emphasis added].

pretrial conference, that this Court will proceed under the "substantial evidence" rule.

Substantial evidence is defined as more than a scintilla, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). It "must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939). The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. NLRB v. Nevada Consolidated Copper Corp., 316 U.S. 105, 62 S.Ct. 960, 86 L. Ed. 1305 (1942).

In reviewing the Secretary's decision concerning the existence of fraud there exists sufficient evidence to be classified as "more than a scintilla." Although there is conflicting evidence that may as readily support the nonexistence of any fraud, a court is not to overturn an administrative determination merely because an alternative conclusion could be drawn. NLRB v. Jas. H. Matthews & Co., 342 F.2d 129 (3 Cir.), cert. den., 382 U.S. 832, 86 S.Ct. 74, 15 L.Ed.2d 76 (1965); Chapman v. Santa Fe Pacific R. Co., 90 U.S.App.D. C. 34, 198 F.2d 498 (1951), cert. den., 343 U.S. 964, 72 S.Ct. 1058, 96 L.Ed. 1361 (1952). Therefore, the Secretary's ruling of the existence of acts in contravention of the contract and in breach of the attorney's fiduciary trust to the client is necessarily approved.

However, the determination that Healing v. Jones and *Utah 030009* were not "claims" is rejected by this Court. As has previously been discussed, under the provisions of the contract defining "claims", both of the disputed actions were "claims". The Secretary's contrary determination is a conclusion of law, not a finding of fact; agency determinations of questions of law are entitled to weight, but are not conclusive. Folsom v. Pearsall, 245 F.2d 562 (9 Cir. 1957). An agency determination of a question of law, unlike findings of fact, does not have any presumption of correctness resulting from the substantial evidence rule and it must be closely scrutinized. Beryllium Corp. v. United States, 449 F.2d 362, 192 Ct.Cl. 12 (1971); Strachan Shipping Co. v. Shea, 276 F.Supp. 610 (S.D.Tex.1967), aff'd., 406 F.2d 521 (5 Cir.), cert. den., 395 U.S. 921, 89 S.Ct. 1773, 23 L.Ed.2d 238 (1969). As suggested by the Fourth Circuit in its prior decision:

> The essential issues in the case are ones of contract interpretation and appropriate remedies if breach of contract is established. There is certainly no compelling agency expertise in this area of the law. These are questions always considered to have been within the special competence of the courts. The notion that the government can administratively give a unilateral and final interpretation to a contract under which it may be obligated to pay, and thereby avoid payment, is one that should not be encouraged.

445 F.2d at 1214. For the reasons above set forth, the Secretary's determination, that Healing v. Jones and *Utah 030009* are not "claims", has been and is found to be "not in accordance with law." [15]

---

15. In addition to being a determination not in accordance with the law, the Secretary's ruling may also be seen as "arbitrary and capricious" and an "abuse of discretion." On a close issue of whether the two disputed actions were "claims" within the contract and whether the compensation for the fruits of nineteen years of service was to be forfeited, the Secretary made a summary decision with no hearing. Although an extensive trial had previously been held, the issue there had been whether the Secretary could

In a similar vein, the Secretary's determination as to the effect of the plaintiff's breach by the use of general counsel attorneys on claims work is also found by this Court to be not in accordance with law. It is commonly recognized that an attorney occupies a high position of trust with his client, and that an attorney must exercise the utmost good faith, fairness and fidelity toward his client. Baker v. Humphrey, 101 U.S. 494, 25 L.Ed. 1065 (1879); Littleton v. Kincaid, 179 F.2d 848 (4 Cir. 1950). A large number of authorities have denied recovery of an attorney's fee on the ground that the attorney's conduct was contrary to the character of the profession. *See, e. g.*, In re Skoll, 78 Minn. 408, 81 N.W. 210 (1899); In re Conrad, 340 Mo. 582, 105 S.W.2d 1 (1937); Ingersoll v. Coal Creek Coal Co., 117 Tenn. 263, 98 S.W. 178 (1906). This forfeiture of fees has also been extended to a denial of recovery on the basis of quantum meruit. In re Lee's Estate, 214 Minn. 448, 9 N.W. 2d 245 (1943). In these instances, however, the attorneys have committed actual, flagrant acts of fraud. In the instant action, although there were sufficient facts in the record for the Secretary to find that the plaintiff technically breached his contract and therefore breached his fiduciary duty, there is no indication of a deliberate scheme on plaintiff's part, to defraud his client.[16]

The general purpose of the decisions denying compensation to the defrauding attorneys is the protection of the client's interest and the integrity of the legal profession. While in most cases this procedure is a proper method to handle such transgressions, with the particular facts of the instant action, such a strict following would be inequitable. The plaintiff worked nineteen years for the Navajo; he was apparently diligent in his work, and his services have brought forth victories for the Tribe. From the record there are no indications that plaintiff's transgressions were deliberate.[17] The acts plaintiff committed appear to be the result of carelessness and negligence on plaintiff's part. In large part this seems to be due to the closeness with which plaintiff has worked with the Tribe, and the resulting laxity in transactions that developed over the long years of association. Plaintiff has not profited from his mistakes, except to the extent of his use of general counsel on claims work—whose value can be set-off from any recovery plaintiff receives.[18] The client's only loss was the value of the general counsel's services, the amount of which is de-

cancel the plaintiff's contract as general counsel, not plaintiff's right to compensation for his services and not whether the disputed actions were claims.

16. The facts of this action also differ from prior actions where fees were deemed forfeited because, while in those actions it was the *client who was refusing to pay*, here the client has never once objected to the performance by plaintiff of his services nor refused payment. Instead, it is the Secretary, as overseer of the client's interests, who is refusing to pay.

17. Judge Sirica's findings in the earlier proceedings are not now binding on this Court. *Mutual Life Insurance Co. v. Hill*, 193 U.S. 551, 24 S.Ct. 538, 48 L.Ed. 788 (1904). However, since he was able to observe the witnesses, his findings must be given some persuasive weight; and throughout his opinion, Judge Sirica gave strong emphasis to the plaintiff's honesty and sincerity. For example, it was found that:

During the seventeen and a half years that the plaintiff, Norman M. Littell, has acted as the General Counsel and Claims Attorney of the Navajo Tribe of Indians, he has at all times represented his client competently, faithfully, loyally and honestly. 242 F. Supp. at 663, Fdg. 80.

It was further found that:

The conclusions reached by the Court at the close of the contempt hearing, that the plaintiff is "a man of outstanding integrity and character," and that he is "an outstanding lawyer," have not been altered by any of the testimony adduced against him at the trial, but have on the contrary been in every respect confirmed. *Id.*, Fdg. 81.

*See also* note 4, *supra*.

18. The Solicitor, in his initial report to the Secretary, suggested that set-off would be an appropriate procedure to follow. *Joint Appendix* at 216.

ductible. Beyond that, not only did the client suffer no loss, but it profited from plaintiff's services. If the only purpose of a forfeiture of fees would be the protection of the legal profession's integrity, other, more effective, avenues were available.[19]

## CONCLUSION

Plaintiff represented the Navajo Tribe in three "claims" actions, the services for which he is entitled to compensation [in the case of *Utah 030009*, only upon an eventual successful completion]. Plaintiff is also entitled to the $18,023.70 in fees remaining due for services performed under the general counsel contract during the period of the injunction. Although plaintiff has committed some acts that were inconsistent with the high duty owed by an attorney to his client, they were not serious, deliberate transgressions, but were incidents of negligence and carelessness. The Tribe was not injured by plaintiff's actions in any way that cannot be recouped. Therefore, the plaintiff should recover his contingency fees for claims services [20] and the remainder of his general counsel fees, with interest as to the liquidated amounts, set-off by the value of the general counsel services used on claims work.

Unless (hopefully) the parties can agree upon the amount to be set-off, the burden will be upon plaintiff to establish the fair value of his services as provided for by the contract, after crediting or deducting the fair value of the services of assistant general counsel used on claims work.

19. Apparently no indictment for plaintiff's alleged fraudulent actions was ever brought, nor were any disciplinary proceedings instituted, either of which would seem more appropriate if plaintiff's actions actually deserved punishment.

20. The Secretary, in asking plaintiff to resign as general counsel, found his alleged dereliction in duty no impediment to plaintiff continuing as claims attorney. *Joint Appendix* at 1749. This would seem, at least, to recognize the severability of Mr. Littell's employment. Although many cases on the breach of fiduciary trust by an attorney call for forfeiture of all fees, this is not an absolute. As stated in Rippey v. Wilson, 280 Mich. 233, 273 N.W. 552 (1937): "we find no authority that where the services are severable, misconduct as to one phase forfeits fees as to another. Such a rule would be generally unfair. . . ." 273 N.W. at 556. Cases using this severance theory have involved situations where compensable services had been performed by the attorney prior to his malfeasance and several courts have allowed recovery of those fees. Rippey v. Wilson, *supra*; Odom v. Hilton, 105 Ga.App. 286, 124 S.E.2d 415 (1962); Coleman v. Moody, 52 Tenn.App. 138, 372 S.W.2d 306 (Western Section 1963). A similar analogy could be drawn to plaintiff's situation, and the severability of the contract would require a recognition of Mr. Littell's right to recover *at least* on the claims cases, subject to the appropriate set-off (since the breach was in contravention of the terms of the general counsel portion of the contract and not the claims portion).